# CHARLESTON.

BLAKE LEMLEY RAMAGE v. SOUTH PENN OIL COMPANY.

Submitted February. 21, 1923.   Decided May 22, 1923.

1. MINES AND MINERALS—"*Surface*" *Subject of Conveyance Construed in Light of Circumstances and Situation of Parties.*

The term "surface" when used as the subject of a conveyance is not a definite one capable of a definition of universal application, but is susceptible of limitation according to the intention of the parties using it; and in determining its meaning regard may be had, not only to the language of the deed in which it occurs, but also to the situation. of the parties, the business in which they were engaged, and to the substance of the transaction.   (p. 103).

2. FORMER HOLDING OVERRULED.

Point one of the syllabus in *Williams v. South Penn Oil Company*, 52 W. Va. 181, is overruled.   (p. 104).

3. DEEDS—*Elements Given Consideration to Determine Meaning of Words not of Definite Import, Stated.*

In determining the meaning of words not of a certain and definite import used in a deed, consideration will be given to the situation of the parties, the subject matter of the deed, the purpose sought to be accomplished thereby, and the acts of the parties thereunder.   (p. 103).

4. CONTRACTS—*Interpretation by Parties to Ambiguous Contract Entitled to Great Weight and May be Controlling.*

Where a contract is 'ambiguous, the interpretation placed upon it by the parties may be entitled to great weight, and in some instances it may be controlling.   (p. 103).

5. MINES AND MINERALS—*Deed for "Surface" of Lands Construed to Carry All of Land Except Oil and Gas Rights Specifically Reserved.*

Thyng and Loan, non-residents, in 1889, engaged in an oil mining partnership in Monongalia County, near the beginning of the oil industry in that section, leasing various oil and gas lands and drilling for oil and gas.   They purchased one tract of land in fee, but immediately thereafter conveyed the "surface", except the oil and gas rights in the land, to the Lemleys, who were farmers residing in the neighborhood on lands of their own.   At that time there was no coal development, nor

had there been any sales of coal lands in that vicinity. Within a year or so after the grantors had made the deed, they drilled a well or wells for oil and gas through the Pittsburgh vein of coal, on adjoining lands, so that, they might reasonably infer that the same vein extended under the "surface" conveyed to the Lemleys, but they made no claim to the coal under the Lemley "surface", and for twenty-five years failed to have it entered on the land books for taxation. A few years after the deed was made, the partner who acquired the firm's interest in the Lemley tract, conveyed it away, designating the interest as oil and gas. Considering the language of the deed, the nature of the transaction, the situation of the parties, the business in which they were engaged, and their conduct indicating construction of the deed, the grant of the "surface" carried with it all of the land, except the oil and gas rights specifically reserved. (p. 104).

Appeal from Circuit Court, Monongalia County.

Suit by Blake Lemley Ramage against the South Penn Oil Company and others. From a decree for plaintiff, the named defendant appeals.

*Affirmed.*

*A. B. Fleming, Kemble White* and *Chas. Powell, C. S. Andrews* and *M. J. Malamphy, Jr.,* and *Glasscock & Glasscock* for appellant.

*Homer W. Williams* and *M. M. Neely* for appellee.

MEREDITH, JUDGE:

Plaintiff brought this suit to have the claims of defendant South Penn Oil Company cancelled as clouds on her title to the coal and mining rights under 110 acres of land in Monongalia County. Each party claims title to the coal and both trace their respective claims of title to a common source, the heirs of James T. Morris, deceased. The circuit court decreed in favor of plaintiff and defendant appeals.

In 1889 Culver G. Thyng of New York and Thomas Loan of Pennsylvania became interested in the oil business in Monongalia County. It was about the beginning of the development of that industry in that section. They leased various lands for oil and gas in the vicinity of the 110 acres and on

June 14, 1889, acquired from the Morris heirs by deed the fee to the 110 acres, for which they paid $9000 in cash. Their business was carried on under the firm name of C. G. Thyng & Co., and the deed for the 110 acres was made to "Culvert G. Thyng and Thomas Loan, doing business under the firm and style of C. G. Thyng & Co." The parties under the firm name, on June 19, 1889, five days after acquiring title, in consideration of $4000 paid, made the following grant to Lewis Lemley and David Lemley:

"all that surface of a certain tract or parcel of land containing 110 acres lying on the head waters of Doll's Run, Monongalia County, West Virginia, known as the tract of land that F. M. *Meredeth* Guardian &c. and Mary F. Morris conveyed to the said grantors on the 14th day of June, 1889, subject to ingress and egress and water privilege for drilling gas and oil wells on the same and the right to lay pipes to convey oil and gas therefrom or over the same, and to work upon said lands in drilling said wells, or removing any or all machinery therefrom and said tract of land is bounded as follows, to-wit."

(Here follows a description of the property by metes and bounds.)

"And it is further understood and agreed that said Grantees take the surface of said tract of land subject to the lease thereon to David Morris to the 1st day of March, 1890, for Two Hundred Dollars and said rent from the 14th day of June, 1889, is payable to said Grantees, but from the 1st day of March, 1889, to said 14th day of June, 1889, is payable to F. M. Meredith Guardian &c., and that the said Grantors in retaining the oil and gas under said tract, shall have the right to go on said land, erect and place the proper machinery thereon for drilling for oil and gas and have sufficient water supply for running said machinery and the right to lay pipes for removing gas or oil therefrom or over said lands doing no more damage to the surface of said farm than is necessary to *develope* and remove said oil or gas from under said farm or tract of land."

The controversy in this case revolves around the effect of this deed, which for brevity we will hereafter call the "Lemley deed." Plaintiff claims the coal under the deed, she

having obtained a conveyance therefor from the grantees; the defendant claims against the deed and asserts title to the coal through subsequent deeds made by the firm, or the members thereof, their heirs or assigns.

Plaintiff introduces certain parol evidence in order to aid the court in interpreting the Lemley deed, to which we will later refer. She also exhibits certain deeds made subsequently by the grantors, which she claims show an interpretation placed on the Lemley deed by C. G. Thyng ,and Thomas Loan and South Penn Oil Company, at variance with the present claims of defendant. These deeds and other deeds under which the defendant claims title to the coal, oil and gas, in brief, are the following:

1.  By deed dated June 20, 1889, C. G. Thyng & Co. for $1762.50 paid, granted to South Penn Oil Company the three-eighths of "the petroleum oil and gas in and under" the 110 acre tract, "with the right of ingress and egress and water privileges for drilling gas or oil wells on the same and the right to lay pipe-lines to convey oil and gas therefrom or over the same, and to work upon said land in drilling said wells or removing any or all machinery therefrom doing no more damage to the surface of said farm than is necessary to develop and remove said oil or gas from under said farm or tract of land."

2.  By deed dated April 16, 1891, Culver G. Thyng conveyed by mortgage to D. C. Conklin all his interest in the following described leaseholds, created by the following oil and gas leases:

> (a). A lease made by Francis B. Michael and wife dated May 16, 1889, covering 80 acres, more or less.
> (b). A lease made by Tossy Michael and others, dated May 20, 1889, covering 53 acres, more or less.
> (c): A lease made by David E. Lemley and Lewis Lemley, dated June 19, 1889, covering 174 acres, excepting 20 acres therefrom by actual measurement, on the northeast corner of the tract.

(d).  ''Also all his right, title, and interest of, in
and to the following described lands and prem-
ises, to-wit:'' (here follows a description of the
110 acres by metes and bounds).

This mortgage was executed to secure Conklin in the pay-
ment of $15,000 and passed by assignments to defendant,
April 21, 1894.

3.  By deed dated August 18, 1891, Thomas Loan and
wife conveyed to Cuthbert G. Thyng, in consideration of
$2000 and other considerations paid, the following described
real estate and personal property in Monongalia County:

(a).  All their interest, being the one-fourth undi-
vided interest in the Morris 110 acres.
(b).  The personal property consisting of ''drilling
tools, 1 cable, 1 sound line, hammers, boiler,
bellows, etc.''
(c).  All their interest, being the one-fourth work-
ing interest, in the Benj. Core leasehold estate,
containing 150 acres.

4.  By deed dated September 11, 1893, and recorded in
Deed Book 37, page 49, Culver G. Thyng assigned and con-
veyed to Jason D. Case:

(a).  All his interest in all that certain tract of land
sold to C. G. Thyng & Co. by F. M. Meredith,
Gdn. etc., being the 110 acre tract, including
the interest therein conveyed by Thomas Loan
and all personal property in Monongalia Coun-
ty, consisting of drilling tools, boilers, engines,
etc.
(b).  All his right, being the working interest, in
the Benj. Core leasehold estate.
(c).  Also all that certain parcel of land containing
154 acres, described as the Lemley land.
(d).  Another tract described by adjoining bounda-
ries, containing 180 acres.
(e).  ''And all the land in the county of Monongalia
in which the party of the first part has any
interest. *The interest hereby intended to be
conveyed is the oil and gas rights in said land
and all the title that the party* of the first ....

94 W. Va.

has therein. Together with all the appurte-
nances, right, title and interest owned by the
party of the first part therein."

5.   By deed dated August 21, 1894, Jasan D. Case, Trustee,
Jason D. Case and Helen C. Case, his wife, Culver G. Thyng
and Mildred L. Thyng, his wife, in consideration of $3000
paid, sold, transferred, assigned and set over unto the South
Penn Oil Company, with covenants of special warranty, the
following described real estate in Monongalia County, West
Virginia, containing 110 acres, more or less, and described
by metes and bounds and being the tract in controversy.
Immediately following the description is the following
paragraph:

"The right and interest hereby conveyed to the above
described lands is all the right, title, and interest of said
parties of the first part, of, in and to the said premises,
which is the right and title to all the minerals, *oil and gas*
in, upon or under said lands, the title to which lands is held
by Lewis Lemley and David E. Lemley." .

By the same deed there is granted all the grantor's interest
in the oil and gas under the Lemley 154 acres leasehold
estate.

6.   On August 11, 1914, the Citizens Bank of Arcade, New
York, The Bank of East Aurora, New York, The Union
National Bank of Franklinville, New York, the latter being
the successor of the First National Bank of Franklinville,
and Jason D. Case, and Helen C. Case, his wife, executed a
deed to South Penn Oil Company, wherein it is recited that
by deed dated September 11, 1893, recorded in Monongalia
County, West Virginia, in D. B. 37, page 49, Culver G.
Thyng conveyed to Jason D. Case certain lands to secure the
banks above named, in certain loans made to Culver G. Thyng,
and that said loans have been paid, and said claims should be
released, and that Culver G. Thyng sold and by deed made by
Jason D. Case individually and as trustee, and Culver G.
Thyng, their wives joining therein, dated August 21, 1894,
"there was conveyed unto said South Penn Oil Company
certain minerals, oil and gas, which deed was recorded in said

Monongalia County, West Virginia, on the 18th day of September, 1894, in Deed Book No. 40, page 83, being all or part of the real estate mentioned and described in the deed first herein set forth;'' then, after stating a consideration of one dollar and other valuable considerations, there follows: said grantors, parties of the first part,` do hereby release unto said grantee, party of the second part, all of their claims, either joint or several, upon the minerals, *oil and gas,* described in said last mentioned deed, dated the.21st day of August, 1894,'' and recorded September 18, 1894, in Deed Book 40, page 83.

7. By deed dated June 30, 1920, after this suit was begun, the heirs and devisees and administrator with the will annexed of Culver G. Thyng, deceased, granted to South Penn Oil Company ''all their right, title and interest in and to all minerals, including all the veins and seams of coal, in upon and underlying'' the 110 acres in controversy.

It is contended by plaintiff that Culver G. Thyng, who *ultimately* became the owner of all the firm's interest in the 110 acres, which remained after the making of the Lemley deed, and his grantee, the South Penn Oil Company, by the various deeds above mentioned distinctly recognized that this remaining interest was only the *''oil and gas'',* with the operating rights; that they so interpreted the Lemley deed and that this construction is binding on defendant.

On the other hand, the record distinctly shows that the Lemleys construed their deed as granting to them the coal. On December 4, 1901, Lewis Lemley, in consideration of other coal, granted to David E. Lemley his interest in the coal and mining rights under the 110 acres. On October 2, 1911, David E. Lemley conveyed the coal to George W. Core, in order to enable Core to make sale thereof. By subsequent deeds, the Lemley title passed to the plaintiff. The coal was assessed with the surface to the Lemleys, and the defendant South Penn Oil Company did not, nor did Culver G. Thyng have the coal entered on the Land Books for assessment of taxes until. 1914, twenty-five years after the Lemley deed was made. At the time the deed was made

there was no coal development in the neighborhood of this land; in fact, the nearest development was in the Fairmont region, more than fifteen miles away, and there only in a small way. No one was selling coal lands as coal lands in the neighborhood. The only activity was in oil and gas lands. The commercial veins of coal, the Pittsburgh and Sewickley, are deep and can only be reached by shafting, and doubtless the coal was not thought of by any of the parties when the deed was executed. In drilling oil wells in that vicinity in the early 'nineties they drilled through the Pittsburgh coal. Thyng and Loan must then have learned of the coal. The Lemleys were farmers residing in the neighborhood, owning large acreage of farm lands, from which the coal had not been sold. These matters are material, and it is important to keep in mind the situation and business of the parties at that time, unless the question of the construction of the Lemley deed is foreclosed by the decision of this court in the case of *Williams* v. *South Penn Oil Company,* 52 W. Va. 181 43 S. E. 214; or *Dolan* v. *Dolan,* 70 W. Va. 76, 73 S. E. 90, Ann. Cas. 1913-D 125.

It is contended by defendant's counsel that the principles laid down in the Williams case were re-affirmed in the Dolan case; but plaintiff's counsel insist that the Williams case is overruled by the Dolan case, and that if it was not overruled, the reference to it is obiter dictum and wholly unnecessary to the decision reached therein; that the Williams case does not correctly state the law, and if not overruled, it ought to be.

In view of the importance of the question involved, we think it proper to re-examine the principles announced in these two cases. For the sake of argument it may be conceded that the deed in the Williams case is substantially like the Lemley deed, except the Williams deed granted the "surface", reserving the coal and mining rights therefor, without mentioning the oil and gas. The Lemley deed grants the "surface", but impliedly, at least, reserves the oil and gas without mentioning the coal. It was held in the Williams case that the oil and gas did not pass by the deed.

Defendant would in like manner have us hold that under the Lemley deed the coal did not pass. It all depends upon the meaning of the word "surface" when used in a deed of this character. In the Williams case it was held: "The word 'surface' when specifically used as a subject of conveyance has a definite and certain meaning, and means only that portion of the land which is or may be used for agricultural purposes." For this definition the court seems to rely upon *Murray* v. *Allred,* 100 Tenn. 100, 43 S. W. 355, 66 A. S. R. 740, 39 L. R. A. 249, and three English cases, *Railroad Company* v. *Checkley,* L. R. 4 Eq. 19; *Hext* v. *Gill,* L. R. 7 Ch. 699, and *Attorney General* v. *Tomline,* 5 Ch. Div. 762. A careful examination of the Tennessee case discloses that the term "surface" was not involved at all. By the deed in that case there was conveyed "a certain tract of land", by proper description, the grantor reserving to himself, his heirs and assigns, "all mines, minerals and metals in and under said land". There were no minerals or metals under the land, except oil and gas, and the sole question was whether oil and gas were within the terms of the reservation, the court holding that they were. In the course of the opinion, the court discusses the severance of land horizontally into strata or layers and incidentally mentions the term "surface" and cites the three English cases as authority for the definition adopted in the Williams case. So much for the Tennessee case.

The first English case, that of *Midland Railway Company* v. *Checkley, supra,* arose under the Canal Act, (34 Geo. III, c. 93), and involved the right of an owner to quarry stone on his land through which the canal extended. The act providing for the compulsory sale of the canal right, which under our law would be termed "condemnation," also provided that nothing in it should extend to or affect the right of any owner of land, in, upon or through which the canal should be made, to the mines and minerals lying and being within or under the land, but all such mines and minerals were thereby reserved to such owner, his heirs, etc., and that it should be lawful for the owner, subject to certain restrictions, to work such mines and minerals. The canal right was

purchased under the statute and the title to the land passed to the railway company. The owner of the tract through which the canal was constructed desired to work his quarry closer to the canal than the plaintiff thought safe, and plaintiff sued out an injunction, which the court stated it would perpetuate upon the railway's making compensation to the owner of the stone which he was thus prevented from quarrying. The railway insisted that stone was not a mineral within the meaning of the Canal Act. In answer to this contention, the court said: "Stone is, in my opinion, clearly a mineral; and, in fact, everything except the mere surface, which is used for agricultural purposes; anything beyond that which is useful for any purpose whatsoever, whether it is gravel, marble, fire-clay, or the like, comes within the word mineral, *when there is a reservation of the mines and minerals from a grant of land;* every species of stone, whether marble, limestone, or ironstone, comes, in my opinion, within the same category." Here, it will be observed, the term "surface" was not involved in the grant, and the reservation was general, not of a specific mineral, but "all the mines and minerals" within or underneath the land.

The case of *Hext* v. *Gill, supra,* involved the question whether china clay was a mineral within the terms of a reservation in a deed for land, the reservation being "all mines and minerals within and under the premises with full and free liberty of ingress, egress and regress, to dig and search for, and to take, use, and work the said excepted mines and minerals." It was held that china clay was a mineral, but the owner under the reservation could not remove it so as to destroy or seriously injure the surface. Aside from the question whether china clay was a mineral, it involved the right of subjacent support. There is nothing in that case upon which the principles laid down in the Williams case could be based in the slightest degree.

The case of *Attorney General* v. *Tomline, supra,* involved the right of the lord of a manor without permission to mine coprolites on the land of a copyhold tenant, and the measure of damages consequent on his doing so. In the opinion, the court quotes from *Hext* v. *Gill, supra,* "a reservation of

minerals includes every substance which can be got from underneath the surface of the earth for the purpose of profit, *unless there is something in the context or in the nature of the transaction to induce the court to give it a more limited meaning.*" It was held that in the absence of a contrary custom, the Lord of the Manor was entitled to the minerals but he could not remove them without the consent of the copyhold tenant and if he did so he was liable for damages, which in that particular case was, by agreement, fixed at half the gross proceeds of the sale of the coprolites mined. That is all there is to that case. Such are the three English cases on which the definition of the term "surface" in the Williams case seems to be based. They are not in point, arise upon entirely different facts from those in the Williams case and in nowise are they even persuasive authority for the decision made. Because they seem to furnish the only real authority cited for the opinion in the Williams case, we have thought it proper to analyze them somewhat in detail.

If the term "surface" as used in the deed "means only that portion of the land which is or may be used for agricultural purposes", the grantees acquired but a mere shell. If this is to be confined to the depth of the plough-share, they could not build the foundation for a permanent house, dig a cellar, or water-well, or post-holes for a permanent fence, remove embedded stone or gravel, or grub a tree whose roots were deeper than the plough-share would go, without committing a trespass. They would not own the soil between plough-share depth and the minerals beneath, for this would belong to the original grantors. Seeing the absurdity to which such a definition leads, Judge BRANNON, in *Dolan* v. *Dolan,* repudiates it, but says that "a conveyance of surface of land, *without more* means all *solum,* the land except minerals.*" That may be true in a conveyance of that character, but that is not this case. In the Lemley deed there is "more", —there is a specific reservation. Again, he says: "When land is purchased, with an exception of the mines and minerals, the purchase includes, not merely the surface but the whole of the sub-soil, which does not consist of mines and minerals. 'Surface' means, not the mere plane surface, but

all the land except mines,' '' citing *Pountney* v. *Clayton,* L.
R. 11 Q. B. Div. p. 840. He does not stop to analyze the
Pountney case to show how the court there was justified in
saying that ''the surface means not the mere plane surface,
but all the land except mines.'' That we propose to do. That
case was one brought against a mine owner for working his
mines under and adjacent to the plaintiff's lands without
leaving sufficient support for the land, whereby the land and
some houses of plaintiff sank and were damaged. It appears
that Penson, the owner of a farm in fee, in 1865, executed
a mining lease for 21 years to defendant Clayton. It pro-
vided that the lessor should not be liable in damages for any
claim in respect to the Wrexham, Mold and Connah Quay
Railway, which was then projected and was to pass over the
farm.   There was nothing in the lease about subjacent sup-
port.   Under the Railways Clauses Consolidation Act, 1845,
which in effect provides a means of condemnation or com-
pulsory sale of lands for railway purposes, the railway com-
pany in 1867 took part of the land and the lessor or owner
conveyed it to the railway pursuant to the act.   In 1876 the
railway sold it as superfluous land, and it subsequently
passed into the hands of Pountney, the plaintiff, who built
some houses on it.   Without giving any notice as provided
in the Railways Act referred to, defendant mined his coal
underenath the land and it subsided.   The action for dam-
ages followed.   As the opinion in that case is based wholly
on certain sections of the railways statute, it is necessary to
quote them in order to understand what was decided.   They
are:

> ''And with respect to mines lying under or near
> the railway be it enacted as follows:
>
> ''Sect. 77.   The company shall not be entitled to
> any mines of coal, ironstone, slate or any other min-
> erals, under any land purchased by them, except
> only such parts thereof as shall be necessary to be
> dug or carried away or used in the construction of
> the works, unless the same shall have been expressly
> purchased, and all such mines, excepting as afore-
> said, shall be deemed to be excepted out of the con-

veyance of such lands, unless they shall have been expressly named therein and conveyed thereby.

"Sect. 78. If the owner, lessee, or occupier, of any mines or minerals lying under the railway, or any of the works connected therewith, or within the prescribed distance, or, where no distance shall be prescribed, forty yards therefrom, be desirous of working the same, such owner, lessee, or occupier shall give to the company notice in writing of his intention so to do thirty days before the commencement of working; and upon the receipt of such notice it shall be lawful for the company to cause such mines to be inspected by any person appointed by them for the purpose; and if it appear to the company that the working of such mines or minerals is likely to damage the works of the railway, and if the company be willing to make compensation for such mines or any part thereof to such owner, lessee or occupier thereof, then he shall not work or get the same; and if the company and such owner, lessee or occupier, do not agree as to the amount of such compensation, the same shall be settled as in other cases of disputed compensation.

"Sect. 79. If before the expiration of such thirty days the company do not state their willingness to treat with such owner, lessee or occupier for the payment of such compensation, it shall be lawful for him to work the said mines or any part thereof for which the company shall not have agreed to pay compensation, so that the same be done in a manner proper and necessary for the beneficial working thereof, and according to the usual manner in working such mines in the district where the same shall be situate; and if any damage or obstruction be occasioned to the railway or works by improper working of such mines, the same shall be forthwith repaired or removed, as the case may require, and such damage made good by the owner, lessee or occupier of such mines or minerals, and at his own expense; and if such repair or removal be not forthwith done, or, if the company shall think fit, without waiting for the same to be done by such owner, lessee or occupier, it shall be lawful for the company to execute the same, and recover from such owner, lessee or occupier the expense occasioned thereby, by action in any of the Superior Courts."

94 W. Va.

The railway company did not "expressly" purchase or condemn any of the minerals, nor acquire any rights in the minerals afterwards. And as the conveyance to it was compulsory and not voluntary, it was held in effect:—(1) That the railway company got all the land except the mines; (2) that it acquired no right to subjacent support as would be the case in a voluntary conveyance; and (3) that the plaintiff, as purchaser of the lands from the railway company, had no higher right than the railway formerly had, hence he was not entitled to recover damages for the subsidence. Justice Bowen, in his opinion, quoting in part from *Rowbotham* v. *Wilson*, 8 H. L. C. 348, says:

" 'There is no doubt', says there Lord Wensleydale, 'that prima facie the owner of the surface is entitled to the surface itself and all below it ex jure naturae: and those who claim the property in the minerals below, or any interest in them, must do so by some grant from or conveyance by him, or it may be from the Crown, as suggested by Lord Campbell in the case of *Humphries* v. *Brogden,* 12 Q. B. 739, 20 L. J. (Q. B.) (N. S.) 10. The rights of the grantee to the minerals, by whomsoever granted, must depend upon the terms of the deed by which they are conveyed or reserved when the surface is conveyed. Prima facie it must be presumed that the minerals are to be enjoyed, and therefore that a power to get them must also be granted or reserved as a necessary incident. It is one of the cases put by Sheppard (Touchstone, chap. 5, p. 89) in illustration of the maxim, 'quando aliquid conceditur, conceditur etiam et id sine quo res ipsa non esse potuit,' that by the grant of mines is granted the power to dig them. A similar presumption prima facie arises that the owner of the mines is not to injure the owner of the soil above by getting them, if it can be avoided. But it rarely happens that these mutual rights are not precisely attained and settled by the deed by which the right to the mines is acquired; and then the only question would be as to the construction of that deed, which may vary in each case.' Now applying what I have said to the grant of the surface of the land, too much stress

> cannot be laid upon what has been pointed out by
> the Master of the Rolls, that the surface means not
> the mere plane surface but all the land except the
> mines.''

It is from this case that JUDGE BRANNON derives his defi-
nition of ''surface'', above quoted. It is true, as stated by
him, that ''when land is purchased, with the exception of
the mines and minerals, the purchase includes, not merely
the surface, but the whole of the sub-soil, which does not
consist of mines and minerals.'' And it is also true, that
when land is purchased, with the exception of the oil and
gas, the purchase includes, not merely the surface, but the
whole of the sub-soil, including coal and all other minerals,
save the excepted oil and gas; in other words, it includes
all the land not excepted. The Pountney-Clayton case did
not involve a conveyance of surface as ''surface'', but a
conveyance of *land,* in which the mines and minerals were
reserved by the terms of the condemnation statute; hence
the term ''surface'' as used in that opinion in defining the
grant necessarily included all the land except the portion re-
served. But if the railway company had expressly pur-
chased part of the minerals with the surface soil we have
no doubt that part of the minerals would have been included
by the court in its definition of ''surface.'' That definition
is correct when applied to the facts and the statute involved
there, but it is too broad for general application, and it does
not fit the facts in this or in the Williams or Dolan cases.
That decision and the definition coined in the opinion rested
wholly on the statute; but it clearly illustrates the practice,
indeed, almost the necessity, of calling the residue of the
land, after the conveyance of a mineral or minerals there-
from ''the surface.'' To do otherwise, where one stratum or
kind of mineral was conveyed away with the surface and an-
other reserved, it would be necessary to find a new word or
phrase for what is generally called the ''surface'', and so
the court said ''the surface means not the mere plane sur-
face, but all the land except the mines,'' because ''the mines''
were reserved.

The case of *Dolan* v. *Dolan*, 70 W. Va. 76, 73 S. E. 90, arose under a will. By the fourth clause the testator said: "I will and devise to my son, Michael P. Dolan, *in fee the surface of my farm* at Wolf Summit, containing three hundred and seventeen acres, also six acres of coal underlying said three hundred and seventeen acres to be located around the dwelling houses and buildings on said three hundred and seventeen acres, so as to preserve and protect the said buildings when the residue of the coal underlying the three hundred and seventeen acres is at any time hereafter mined and removed." By the seventh clause he said: "I further will and devise to my said daughter Catherine all the coal underlying the said tract of three hundred and seventeen acres of land hereinbefore devised to my son Michael P. Dolan, with the exception of six acres of coal hereinbefore reserved and devised to my said son Michael P. as hereinbefore mentioned." By other clauses he made other bequests and devises, but no mention was made of the oil and gas under the 317 acres, nor was there any residuary clause in the will. Michael P. Dolan leased the 317 acres for oil and gas to South Penn Oil Company; the remaining children of the testator, claiming that the oil and gas did not pass by the will and that as to this he died intestate, leased their alleged interests in the oil and gas in 180 acres of the 317 acres to John W. Davis, which lease was assigned to the Washington Gas Company. Later these lessors, including the Gas Company brought an action of ejectment to recover their interests in the oil and gas against Michael P. Dolan, South Penn Oil Company, and Hope Natural Gas Company, assignee of the gas rights under the Michael P. Dolan lease. Following the Williams case, the circuit court directed a verdict for the plaintiffs, but this court reversed the case and entered judgment for the defendants, the court holding that under the will Michael P. Dolan acquired the entire 317 acres, including all the oil and gas, save only the coal devised to Catherine. We think that decision was right; that it clearly appears from the will that Michael P. Dolan was to have the tract of land, with the exception of the coal devised to Catherine. Judge Brannon in part grounds his opinion on the rule of law that where

a man makes a will the presumption is, in the absence of proofs to the contrary, that he intends thereby to dispose of his whole estate; but after discussing the parol evidence offered by the defendants showing that the testator stated when he made the will that he intended to give his daughter Mary but a single dollar, and that she must be disinherited because she was going to marry a certain man against her father's wishes, thus tending to show that he did not intend to die intestate as to any of his property, JUDGE BRANNON adds: *"I do not think this evidence necessary, because I think the will itself gives the word 'surface' meaning plain, and that there is no ambiguity."* He does not, however, carry his definition of the word surface into the syllabus of the case, and the only point decided is that under the will Michael P. Dolan acquired the 317 acres, including all the minerals, except the coal devised to Catherine Dolan. It is true that Judge BRANNON says the Williams case was rightly decided, but that is all. He repudiates the definition of "surface" stated in it and in effect overrules point one of the syllabus. As already stated, the decision in *Dolan* v. *Dolan* was right, but we believe if the words of devise had been used in a deed the conclusion should have been and doubtless would have been the same. The words of the will disclose that Michael P. Dolan was to receive the land, except the coal devised to Catherine, and it was unnecessary, though proper, to refer to the presumption against intestacy as to any of the testator's estate. We can not say, as plaintiff would have us say, that by the decision in the Dolan case the Williams case was overruled. Insofar as it refers to it, the definition of the term "surface" is repudiated in the opinion, another substituted therefor, but not carried into the syllabus, hence left undecided as binding precedent. As we view it, that is now an open question. However, it is but fair to say that if the Williams case was correctly decided, as Judge BRANNON says in the Dolan case, then it is a precedent for the decision in this case, binding upon us, unless we overrule it.

That the term "surface" has various meanings there can be no doubt. Its primary meaning is "the outside or ex-

terior part'' as opposed to the "inside or interior part''. But when used in a deed like the one under consideration, it would be absurd to say that the Lemleys got nothing but the "outside or exterior part" of the land. As JUDGE BRANNON says in the Dolan case, that would not give them one inch of soil. But if it be limited in its meaning to the agricultural part of the land, as stated by Judge McWHORTER in his opinion, and as decided by the court in point one of the Williams case, we are led to equal absurdity. The only difference is that under the Williams case the Lemleys would obtain some of the soil. Suppose we accept JUDGE BRANNON's suggestion, made in the Dolan case: "Where land is purchased, with an exception of the mines and minerals, the purchase includes, not merely the surface, but the whole of the sub-soil, which does not consist of mines and minerals. 'Surface means, not the mere plane surface, but all the land except mines,'" Now this, as well as JUDGE McWHORTER's definition, concedes that the grant of "surface" of land carries a grant of "land"; the only question is how deep does it go. Judge BRANNON would carry it to the center of the earth, but would except out of it all the underlying minerals. But in the Lemley deed there is an express exception of two minerals,—the oil and gas. Does this exclude any other exception? Suppose the exception had also expressly included the Pittsburgh coal. Could it with reason be said that the grantors also excepted the Sewickley and other veins of coal? In other words, should not the maxim, "The expression of one thing is the exclusion of another," apply? In our judgment, it should. When the parties to this deed were negotiating they were doubtless thinking of two things: the land without the oil and gas and operating rights, as one part, and the oil and gas and operating rights as the other part. In other words, they severed them; the land without the oil and gas they called the "surface" and the grantors conveyed it to the Lemleys by that designation, and reserved to themselves the oil and gas with operating rights. In every instance where the term "surface" is so used in a conveyance such severance is in the minds of the parties. It may be that if the word "Surface" is used

as the subject of conveyance, "without more", that is without out any express reservation, then the word "surface" would carry all the solum, or soil, except the minerals. As that is not this case, we do not decide that question, but reserve it for decision as the occasion may arise; but where the conveyance of the "surface" is followed by an express reservation, we think the effect of the reservation is to limit it to those things which are so expressed.

*Bogart* v. *Amanda Cons. Gold Min. Co.*, 32 Colo. 32, 74 Pac. 882, is a case in point. The suit was to enforce specific performance of a contract made between the owners of the Bogart lode claim and the owners of the Amanda lode claim. The contract provided: "The first parties (the owners of the Bogart lode) agree within ten days after the issuance of the patent for the said Bogart lode, to convey to said second parties (the owners of the Amanda claim) *the surface ground* included within the conflict, saving, excluding and excepting from said deed so to be made the Bogart vein, lode, lodge or deposit wherever the same may be found to cross or pass through the conflicting surface." The Bogart owners obtained the patent but refused to convey any minerals below the "surface ground," claiming that the term "surface ground" had a well defined meaning in the mining regions and that it excluded minerals. In answer to this construction, the court said:

> "What was the intention of the parties at the time they made the agreement? If there is any ambiguity in the language employed, it must be resolved in favor of the grantee and against the grantors. The object of the court should be to place itself, as nearly as possible, in the position of the parties at the time, and from the terms of the contract and the surrounding circumstances arrive at their meaning. We do not think there is any difficulty in ascertaining this intention from the language of the written agreement. While there may be two distinct ownerships in mineral land—one of the surface or the soil, and the other of the minerals underneath—we are satisfied that by this agreement the applicant for the patent for the Bogart claim intended to convey to

the owners of the conflicting location not merely the
surface ground in conflict, as contradistinguished
from the mineral beneath, but with this surface
ground all underlying minerals except the Bogart
vein. This is entirely clear from the excepting or
reservation clause of the contract, whereby the own-
ers of the Bogart reserved to themselves, and ex-
cepted from the grant, the Bogart vein. The agree-
ment contemplated that the owners of the Bogart lo-
cation might proceed, without objection from the
senior locators, to obtain a patent for the ground in
conflict. When they got their patent they owned the
entire estate, and by this agreement reserved to them-
selves, and excepted from the operation of the grant,
only the Bogart vein. If it had been their intention
to reserve all the mineral beneath the conflicting sur-
face ground, they naturally would have made such
provision in the exception clause. Not having done
so, but having excepted only the Bogart or cross vein,
it is plain that the intention of both parties was that
the owners of the Amanda lode were to receive a con-
veyance of everything within the conflicting territory
except the specific vein reserved.''

See also: 4 Sharswood & Budd's Leading Cases, Real
property, 270; and *Yandes* v. *Wright,* 66 Ind. 319.

And so in this case; we hold that the express exception
of the oil and gas excludes all other exceptions. We are not
unaware of the contention made that the coal did not pass
by the term ''surface'' as used in the Lemley deed; but be-
cause it was not excepted or reserved, and the oil and gas
were, we think all minerals passed but those expressly re-
tained; hence the Lemleys got the coal.

One other case has been called to our attention by defend-
ant's counsel, which merits some consideration,—that of
*Keweenaw Association* v. *Friedrich,* 112 Mich. 442. That
case involved the construction of a contract of sale of ''the
surface rights'' of a tract of land, containing no express
reservation of the minerals. The offer to sell the surface
rights was contained in plaintiff's letter to defendant. De-
fendant accepted, made the cash payment required, entered
on the land, laid it off into building lots and made some im-
provements. Plaintiff tendered a formal contract, which its

offer required it to do, reserving the right to go on the land at all times and to explore and mine for ores and minerals, and for such time as it might deem expedient, by paying the defendant $100 per acre for the land that might be so occupied. Defendant did not accept or reject the formal contract, but failed to pay the unpaid purchase money. Plaintiff filed its bill to enforce payment. One ground of defense was that the contract tendered was not in accordance with the offer, in that the mining rights reserved were too broad; another was that the contract as made out by the letters was too vague and uncertain to be a binding contract. The trial court held the term "surface rights" was too vague and uncertain; that the minds of the parties had never met upon the precise terms of the contract; and dismissed the bill. The Supreme Court affirmed the decree, by a divided court; it seems to have based its affirmance on the ground that the formal contract tendered was not a substantial performance on plaintiff's part as required by its letter, because the mining rights retained in the formal contract were too extensive, but without deciding the point, it says: "If the term 'surface rights' has a definite meaning, as used in the agreement, it must be a fee in the lands, subject to a reservation of the minerals in the grantor," a meaning which was conceded by the plaintiff. That is the substance of that case, and it is only valuable for the purpose of throwing light upon the meaning of the term "surface rights" in a contract for the conveyance of lands, when those rights are the subject of the contract, and there is no express reservation of the mineral rights. Now we can not concede that the term "surface rights" has a well defined legal meaning. We think that term might have one meaning in one contract or deed and quite another meaning in another contract or deed, depending very largely upon the circumstances, and the intention of the parties would be controlled by the nature of the transaction and by the circumstances and surroundings under which it is made. In our judgment the term is ambiguous. And so, too, we think the term "surface" does not have a well defined legal meaning when used as the subject of conveyance, but its meaning may be limited and defined by the

exception or reservation in the deed. If the deed grants the "surface" but contains a reservation of all the mines and minerals, the grant includes all the land except the reservation; but, on the other hand, if it grants the "surface" but contains a reservation of a specified mineral or minerals, then the grant includes all the land except the mineral or minerals specified. If the grant be of the "surface", without any qualifying exception or reservation, it may include everything but the minerals, though that would not necessarily follow from the use of the word "surface", as it might be limited by the nature of the transaction, the object of the instrument, the situation of the parties and the surrounding circumstances. For example, suppose there were no minerals. Clearly, according to this contention, a grant of the surface would carry a fee in the whole of the lands; hence the meaning of the term "surface" would be controlled by the circumstance whether there were minerals under it.

The word "surface", so far as we have been able to ascertain from the adjudged cases, and we have examined all that we could find, is never used as the subject of conveyance except in those instances where there is a severance contemplated, either express or implied, of the land from some mineral or other interest upon it or under it. Now it has been decided many times that the expression "mines and minerals" or "minerals" when used in a deed, will include every inorganic substance which can be extracted from the earth for profit; but such an expression may be restricted or controlled in its meaning by the context, as in *Horse Creek Land & Mining Co. v. Midkiff,* 81 W. Va. 616, 95 S. E. 26, 17 A. L. R. 157, where the word "coals" was held to be in apposition to the preceding words "all the minerals," and the reservation was limited to coals; and as in *Rock House Fork Land Co.* v. *Raleigh Brick & Tile Co.,* 83 W. Va. 20, 97 S. E. 684, 17 A. L. R. 144, where it was held that a reservation of "all the coal and other minerals of every kind and description except gas and oil in and underlying said land" did not reserve the brick clay under the land, because of the peculiar mining rights contained in the reservation. The court said: "The term 'mineral' is not a definite one cap-

able of a definition of universal application, but is suscept-
ible of limitation according to the intention of the parties
using it, and in determining its meaning regard must be
had, not only to the language of the deed in which it occurs,
but also to the relative position of the parties interested, and
to the substance of the transaction which the deed embodies.''
Now may not the term ''surface'' also have various mean-
ings? As stated by JUDGE BRANNON in *Preston* v. *White*, 57
W. Va. 278, 50 S. E. 236, ''But when the owner of land
conveys to another the oil or gas, that oil or gas becomes a
property distinct from the residue or remnant of the land,
distinct from the ''surface,'' as the expression is in the
books.'' And if he should afterward convey to another
the Pittsburgh vein of coal, the interest remaining, even
though it contained other veins of coal, would still be called
the ''surface''. We repeat, that where the term ''surface''
is used as the subject of a grant, the grantor and the grantee
have in mind a severance of the land into two parts, and
while if but one part be designated, to-wit: the surface, the
grant may include all the land except the minerals, though
that does not necessarily follow; but if the other be also
expressed by reservation or exception, it appears to us that
this clearly shows the intention of the parties, and the ex-
ception or reservation, as in the instant case, controls, limits
and defines the subject of the grant. We see no other
office for the reservation in the Lemley deed. It does not
enlarge the grant, as objected by defendant's counsel.

But if the meaning of the term ''surface'' be ambiguous
in a conveyance as last described, then the court should in-
quire into the nature of the transaction, the situation of the
parties, the purpose sought to be accomplished, and the in-
terpretation, if any, placed thereon, as shown by the acts of
the parties. If in construing the term ''mineral'' in a
deed, the court can look not only to the language of the deed,
but to the relative position of the parties interested, and to
the substance of the transaction which the deed embodies,
as in *Land Co.* v. *Brick Co., supra,* we see no good reason
why the same may not be done in considering the term
''surface'' in the Lemley deed. In doing this, we first find

94 W. Va.

that the grantors were, partners; they acquired the land as partners; they conveyed the "surface" in the same manner. They were engaged in the oil and gas business, acquiring oil and gas properties; by lease, if they could be so obtained; by purchase of the land, if necessary. They nowhere in the record appear to have been buying coal or interested in coal lands, other than by obtaining this coal by the purchase of the 110 acres in question. They were engaged in drilling for oil and gas. When they sold their remaining interests in the 110 acres to defendant South Penn Oil Company, they designated that interest as oil and gas. Within a very few years after the transaction in question, they drilled a well or wells in the neighborhood of the 110 acre tract, and the "log" doubtless showed that they drilled through veins of coal, which they might have reasonably assumed extended under the 110 acre tract, yet they made no claim to coal, nor did they have it assessed in their names, but left it off the land books for twenty-five years. While not conclusive, yet these circumstances have a strong bearing on the case. It has been frequently held that in construing a contract containing an ambiguity, the interpretation placed upon it by the parties should have great weight, indeed it may often be controlling. See: *Elk Refining Company* v. *Falling Rock Cannel Coal Company,* 92 W. Va. 479, 115 S. E. 431. "In determining the meaning of words not of a certain and definite import used in a contract, consideration will be given to the situation of the parties, the subject matter of the contract, the acts of the parties thereunder ,and the purpose sought to be accomplished thereby." *Wetterwald* v. *Woodall,* 83 W. Va. 647, 98 S. E. 890.

In our judgment, the term "surface" when used as the subject of conveyance does not have a definite legal meaning and that in construing such a conveyance, as in this case, we should give consideration to the context of the agreement, the situation of the contracting parties, the business in which they were engaged, the subject matter of the conveyance, the purposes sought to be accomplished and the conduct of the parties under it. We are not unmindful that cases like that of *Williams* v. *South Penn Oil Company, supra,* should not be

overruled except for the soundest reasons, but we think that decision wrong; and less harm will be done by righting the wrong than by perpetuating it. Neither can we follow so much of *Dolan* v. *Dolan* as approves the decision in the Williams case. The deed in the instant case antedates by some years the date of the deed construed and of the decision rendered in the Williams case; so it can not be said that the grantors in the Lemley deed deliberately retained the coal because of that decision. When they conveyed the "surface" they conveyed the land, retaining only the oil and gas with the right to operate therefor.

For the foregoing reasons the decree is affirmed.

*Affirmed.*

MILLER, JUDGE, *dissenting*:

By her original and amended bills plaintiff, claiming title to certain conveyances to the coal and mining rights and privileges in a tract of one hundred and ten acres of land in Monongalia County, sought to have construed the deeds with some of their particular provisions under which the defendant claims title to the same coal and mining rights, and prayed that those deeds be removed as clouds upon her title to said coal and mining rights.

The answer of the South Penn Oil Company denied the construction put upon the deeds by plaintiff and put in issue all extraneous facts showing or tending to show that those deeds should receive a construction different than that claimed by them, and according to their plain terms and conditions.

The claims of both parties to this coal and said mining rights originated in the deed of June 14, 1889, and from J. T. Morris' heirs to Culver G. Thyng and Thomas Loan, trading as C. G. Thyng & Company, whereby the grantors, in consideration of nine thousand dollars, conveyed to the grantees with covenants of special warranty by metes and bounds the said tract, described as containing one hundred and ten acres.

The deed next in order of time, and the one upon which

the parties differ in their respective contentions, is the deed from C. G. Thyng & Company to Lewis Lemley and David E. Lemley, dated June 19, 1889, only four days after the date of the first deed referred to, and whereby in consideration of the sum of four thousand dollars, the receipt whereof was thereby acknowledged, the said grantors thereby did "grant and convey unto the said Lewis Lemley and David E. Lemley *all that surface of a certain tract or parcel of land* containing 110 acres lying on the head waters of Dolls Run, Monongalia County, West Virginia, known as the tract of land that F. M. Meredith Guardian &c. and Mary F. Morris conveyed to the said grantors on the 14th day of June, 1889, subject to ingress and egress and water privilege for drilling gas and oil wells on the same and the right to lay pipes to convey oil and gas therefrom;" said tract being bounded as in the first deed referred to; and then containing these additional provisions: "And it is further understood and agreed that said grantees take the *surface of said tract of land subject to the lease thereon to David W. Morris to the first day of March*, 1890, for Two Hundred Dollars and said rent from the 14th day of June, 1889, is payable to said grantees, but from the first of March, 1889, to said 14th day of June, 1889, is payable to F. M. Meredith Guardian &c., *and that the said grantors in retaining the oil and gas under said tract, shall have the right to go on said land, erect and place the proper machinery thereon for drilling for oil and gas and have sufficient water supply for removing gas or oil therefrom or over said land doing no more damage to the surface of said farm than is necessary to develope and remove said oil or gas from under said farm or tract of land.*"

The next deed in order of those exhibited with the bill is that of said C. G. Thyng & Company to South Penn Oil Company, dated June 20, 1889, whereby in consideration of the sum of seventeen hundred and sixty-two dollars and fifty cents, receipts whereof was thereby acknowledged, the grantors did thereby "grant unto the said grantee, three eighths (⅜) of the petroleum oil and gas in or under a certain tract or parcel of land containing 110 acres," and further described

as the same tract granted to the grantors June 14, 1889, and with the same rights and privileges as their grantors conveyed to them.

The next deed in the chain of title of defendant company sought to have removed as a cloud upon plaintiff's title so far as it may affect her alleged right and title to the coal and mining rights and privileges, is a deed dated August 21, 1894, from John D. Case, Trustee, Jason D. Case and Helen Case, his wife, and Culver G. Thyng and Mildred K. Thyng, his wife, to the South Penn Oil Company, whereby in consideration of the sum of three thousand dollars, the receipt whereof was thereby acknowledged, the grantors thereby "sold, assigned, transferred and set over, with covenants of special warranty, unto the said party of the second part the following described real estate, situate, lying and being in the County of Monongalia," and by metes and bounds described as in the previous deeds, and as containing 110 acres, more or less. After the description of the land is the following: "The right and interest hereby conveyed to the above described lands is all the right, title and interest of the said parties of the first part, of in and to said premises, *which is the right and title to all the minerals, oil and gas in, upon, or under said lands, the title to which lands is held by Lewis Lemley, and David E. Lemley.* The said parties of the first part do hereby grant unto the said party of the second part, all their right, title, interest of, in & to all the petroleum oil and gas in and under that certain other tract or parcel of land in Monongalia County, and State of West Virginia, containing one hundred and fifty-four acres, more or less, with the right of ingress and egress upon said land, sufficient water privileges necessary to the operation thereon, together with the right to all pipes to convey oil and gas, and the right to remove machinery and fixtures, which tract of land contains in all one hundred and seventy-four acres, more or less, reserving and excepting twenty acres hereafter mentioned, leaving one hundred and fifty-four acres conveyed hereby, and said certain tract of land adjoins the following named lands, to-wit; other lands of the two Lemleys above

named, Jefferson Tennant, Asa Sutton, John Barrackman and Sanford Barrackman, excepting and reserving twenty acres therefrom by actual measurement on the north east corner of said tract of land but said twenty acres is not to extend further south than the sugar house on said premises."

The plaintiff claims that at the time C. G. Thyng & Company, by their deed of June 19, 1889, conveyed to the Lemleys the tract of 110 acres, described as "all that surface of a certain tract or parcel of land," the Lemleys by their deed of the same date, and as a part consideration of the said grant to them, conveyed to C. G. Thyng & Company the oil and gas with like mining rights in and under their adjoining tract of 154 acres, more or less, mentioned in said deed of August 21, 1894. We do not find this Lemley deed in the record. Their theory of the transaction is that these deeds were intended to leave vested in C. G. Thyng & Company only the oil and gas in the 110 acres and to invest in them the oil and gas with like mining rights in the 154 acres as those reserved in their deed for the 110 acres.

The South Penn Oil Company, in its answer, besides the deeds already referred to and exhibited with the bill pleads and relies on the deed of William H. C. Thyng and others, described as the children and heirs at law and devisees of the said C. G. Thyng, deceased, dated June 30, 1920, whereby said grantors, for the consideration of "one dollar and of other valuable considerations paid by the party of the second part to the parties of the first part the receipt whereof is hereby acknowledged, as well as other considerations moving them" thereto, did "sell, grant and convey unto said party of the second part all of their right, title and interest in and to all the minerals, including all the veins and seams of coal, in, upon and underlying all that certain tract of land lying and situate on the head of Doll's Run in the County of Monongalia," and describing the land by the same metes and bounds contained in the prior deeds, and as containing 110 acres, "excepting the oil and gas underlying said land," with covenants of special warranty, and referring for their title to said land to the deed granting the same

to said Culver G. Thyng and Thomas Loan by F. M. Meredith and others, of June 14, 1889.

It is conceded by counsel for plaintiffs that whatever right, title and interest remained in the said C. G. Thyng & Company, their heirs, devisees and grantees not conveyed to the said Lewis Lemley and David E. Lemley by the deed of June 19, 1889, has by the several deeds under which it claims title become thereby vested in the defendant South Penn Oil Company. And we understand it is likewise conceded that whatever right and title to the said tract was conveyed by the said C. G. Thyng & Company to the said Lewis Lemley and David E. Lemley by the deed of June 19, 1889, has by the various deeds under which she claims thereby become vested in the plaintiff Blake Lemley Ramage, and that if she has thereby become vested with right and title to the coal and mining rights in and under the said tract of 110 acres, she is entitled to the relief prayed for and granted by the decree appealed from.

It is therefore apparent that the rights of the parties, for the most part, depend on the true construction of the provisions of the deed from C. G. Thyng & Company to Lewis and David E. Lemley, of June 19, 1889, whcih have been heretofore recited. Such rights, title and interest as were not conveyed by that deed to the Lemleys, of course remained in the grantors and have come down to the South Penn Oil Company. It will again be observed that the deed by its terms purports to convey "all that surface of a certain tract or parcel of land containing 110 acres * * * subject to ingress and egress and water privilege for drilling gas and oil wells on the same and the right to lay pipes to convey oil and gas therefrom or over the same and to work upon said land in drilling said wells, or removing any and all machinery therefrom." And that deed also contains this further covenant: "And it is further understood and agreed that said grantees take the *surface* of said tract of land subject to the lease thereon to David Morris to the 1st day of March 1890." And furthermore; that "the said grantors in retaining the oil and gas under said tract, shall have the

right to go on said land, erect and place proper machinery thereon for drilling for oil and gas and have sufficient water supply for running said machinery   *   *   *   doing no more damage to *the surface* of said farm than is necessary to develope and remove said oil or gas from under said farm or tract of land.''

From the written opinion of the judge of the circuit court it would seem that the decree was rested mainly on what the court regarded as the local meaning of the term ''surface'' in Monongalia County, which the court regarded as controlling, regardless of the prior decisions of this court to be presently referred to. If this proposition be sound, then as suggested in argument, every case of this kind would have to be determined by reference to the local meaning of the words employed in the instrument and not according to their plain and ordinary meaning as defined by lexicographers and others. Such a view of the law would, it seems to me, be building property rights upon foundations of sand, which ought not to be regarded with favor by the courts. The defendant company plants itself and predicates its rights on the principles of *Williams* v. *South Penn Oil Company,* 52 W. Va. 181 and *Dolan* v. *Dolan,* 70 W. Va. 76, 79, 82. On the other hand counsel for plaintiff contend that the first of these cases has been practically overruled by the second, and besides, that the principles of these cases are inapplicable to the deed here in question, but that the proper rules laid down for the interpretation of instruments of this character are those pronounced in *Rock House Fork Land Co.* v. *Raleigh Brick & Tile Co.,* 83 W. Va. 20; that the term ''surface'' in the present deed is ambiguous and uncertain, and that to properly interpret this deed the court should look to the conditions surrounding the parties at the time of the contract and the purposes contemplated and that were in the minds of the parties at the time of entering into the contract.

In *Williams* v. *South Penn Oil Company,* the provisions of the deed under consideration were so nearly like those in the present deed that whatever rules ought to govern the one should certainly control the construction of the other

We find no attempt by counsel for plaintiff to differentiate them by the slight difference in verbiage, or otherwise. In that case, after the conveyance of the surface, the rights specifically reserved pertained to coal; in this case they relate to the oil and gas. In the former case the controversy was over the right to the oil and gas; in this case it is a controversy respecting the right to the coal claimed by the plaintiff under a deed granting only the surface. So that there are no distinguishing characteristics between them. In the Williams case it was decided that the grant of the "surface", though only mining rights to take the coal were reserved, did not carry with it the right to the oil and gas as a part of the grant; that the reservation only of the mining rights pertaining to the coal in a grant of the surface did not indicate an intention to convey title to all the other minerals. If such was the proper construction of the deed involved in the Williams case, it must control the interpretation of the deed here in question, so as to leave invested in the grantors C. G. Thyng & Company everything except the surface as defined in that and other cases to be referred to, and not as including any of the coal or coal seams granted to the defendant company.

But was the Williams case overruled by *Dolan* v. *Dolan?* The opinion in that case distinctly negatives this proposition. It says that that case was decided right, and instead of overruling it, it approves it. The only thing in that case relied on by plaintiff's counsel is, that it is there said that the statement of the law in the first point of the syllabus is inaccurate. That point is as follows: "The word 'surface' when specifically used as a subject of conveyance has a definite and certain meaning, and means only that portion of the land which is or may be used for agricultural purposes." In the Dolan case JUDGE BRANNON, after referring to the Williams case and to other judicial decisions and text writers, concludes from them that a conveyance of the surface of land without more, means all the *solum,* the land except the mineral. And in answer to the question, "Why?" he says: "Because the word 'land' is not used; if it were, it would take the minerals.

The word 'surface' is used, more limited, and the courts have said it excepts minerals."· In the Dolan case the first point of the syllabus is a "Quaere", not a point of decision, as follows: "*Quaere.* What does the word 'surface' alone, without qualifying words, in a devise of land mean? Does it pass minerals in the land?" The only point of decision is the second one, as follows: "The will in this case confers upon Michael P. Dolan the land devised to him, including minerals, except coal." The fourth clause of the will in that case was: "I will and devise to my son, Michael P. Dolan, in fee the surface of my farm at Wolf Summit containing three hundred and seventeen acres, also six acres of the coal underlying the same", etc. Distinguishing that case from the Williams case, Judge Brannon has recourse to the fact that it was a will he was dealing with and not a deed, and that the presumption against intestacy had to be regarded. To have decided otherwise would have left the testator intestate as to the minerals not reserved and devised to his daughter where there was manifest intention in the will to dispose of the whole estate and leave nothing undisposed of thereby. And besides this feature of the will, it appears that the testator, in the seventh clause, in devising the coal to his daughter, had recourse again to the fourth clause, and therein declared that by the fourth clause he had devised the said tract of three hundred and seventeen acres of "land," not "surface". These and other provisions of the will were, in the opinion of the court, sufficient to differentiate that case from the Williams case. So the Dolan case must not be regarded as overruling or affecting the authority of the Williams case, so far as the principles which controlled its decision are concerned. The effect of that decision, and of the Dolan case approving it, is that there were not in the deed under construction any words or provisions denying the word "surface" the effect of its plain and ordinary meaning, when employed in a deed of conveyance. Who could say, who would say, in these days, when the right to segregate and convey the surface and all of the many strata, coal, oil, gas, iron, salt and other minerals and to hold them in severalty is fully recognized and protected, that a conveyance of the

"surface" without more would take with it all the minerals not specifically excepted? It may be true, as counsel argue, that in 1889 coal was not in the minds of the contracting parties and that it was not known to exist in the 110 acres of land. It may now be true also that there are many other minerals existing in the land, but unknown; but would it be contended that this fact would give to the grantee of the surface all minerals not within the knowledge of the parties to the contract, which would except the minerals? A number of our decisions say that a grant or reservation of all the minerals in or underlying a tract of land will carry all minerals existing therein although their presence was unknown at the time of the grant. "Ordinarily," says one of our decisions, "in the interpretation of a deed or other instrument, intention indicated only by an unnecessary inference or implication, is not allowed to prevail over a different intention expressed in the words." *White Flame Coal Co.* v. *Burgess.* 86 W. Va. 16. And again in *King* v. *Smith,* 88 W. Va. 312, we held that: "The courts will not, by construction, enlarge the estate conveyed by a deed, where the langauge of the grant is clear, plain and free from ambiguity." In *Rock House Fork Land Co.,* v. *Raleigh Brick & Tile Co., supra,* it is said that, "where language of certain import is used it will be presumed that the parties intended the language to have its ordinary and accepted meaning, unless there is a clear expression of intent that the language was used in a different sense."

As against this construction of the deed of June 19, 1889, to the Lemleys, already indicated, and the prior decisions relied on, plaintiff's counsel say that if the case of *Williams* v. *South Penn Oil Company* be not overruled in *Dolan* v. *Dolan,* it is repudiated, if not overruled, by the cases of *Rock House Fork Land Co.* v. *Brick & Tile Co.,* just referred to, and by *Horse Creek Land & Mining Co.* v. *Midkiff,* 81 W. Va. 616. I have already referred to the first case. The meaning of the term "surface" used in a grant was not there involved. The court was there dealing with the term "minerals" and what the parties meant by the words "other minerals" used in the

grant. The question in that case was whether those terms included a "certain seam of clay;" and construing the deed with reference to other provisions defining the mining rights, we held, point 2 of the syllabus: "Where a deed grants the coal and other minerals in a tract of land, as well as certain rights to be enjoyed by the grantee in the production of such minerals, and the rights so granted are of the character which are necessary to be enjoyed, and which are ordinarily enjoyed, in the production of minerals from mines, that is, by the process of shafting and tunneling therefor, and there is nothing else showing just what substances the parties intended to include by the language of the grant, the intention of the parties as to the extent of the minerals granted may be determined from the language of the mining rights granted as incident thereto, and such grant limited to such minerals as are ordinarily produced by the exercise of such mining rights as are granted by the deed." There is nothing in that case in conflict with either the Williams or Dolan case. Indeed these cases are not even referred to, or any effort made to distinguish them. The same may be said of *Horse Creek Land & Mining Co.* v. *Midkiff;* for in that case the Williams and Dolan cases are not mentioned, nor any indication of an intention to change or affect their authority. The only application the latter case can have to the case at bar would be to that provision of the deed of August 21, 1894, from John D. Case and others to the defendant company, defining the right and interest thereby conveyed, and already quoted, "which is the right and title to all the minerals, *oil and gas* in, upon or under said lands, the title to which lands is held by Lewis Lemley, and David E. Lemley." It is said that the words, "oil and gas in," are placed in apposition to the words "all the minerals" and are descriptive of the kind of minerals intended by the instrument, as well as the word "coals" after the words "all minerals" in the Horse Creek Land Company case, and justifies the conclusion in this case as in the former, that only the oil and gas were intended by the grant. But it seems to us to be a sufficient answer to this proposition that it matters not what the

grantors in the deed in which these words occur intended thereby. The question here is, what did the Lemleys get by the deed to them of June 19, 1889? In that deed no such appositive words occur. Besides, the defendant company does not rely alone on the deed of August 21, 1894. It has obtained and impleaded in support of its right and title the deed of June 30 ,1920, already quoted; and unless the plaintiff acquired from the Lemleys and her intermediate grantors the right to the coal, undoubtedly the defendant got the coal, if not before by its other deed, certainly by the later deed of June 30, 1920.

Two other points are made against defendant's claim of title, which perhaps should be mentioned: First, that in the deed of August 21, 1894, the mineral rights granted are described as "upon, or under said lands, the title to which lands is held by Lewis Lemley, and David E. Lemley." But if only the title to the surface thereof passed to them by the deed of June 19, 1889, the recital in the deed of August 21, 1894, would not change the fact nor operate as an admission or be matter of estoppel on defendant or its grantors. This recital is not inconsistent with its claim to the minerals, for they did and do underlie the land to which the Lemleys had title to the surface.

The second proposition is that not until 1914 did either the Thyng heirs, the South Penn Oil Company or any intermediate holder cause the coal or other minerals to be separately assessed and pay the taxes thereon. Since and including that year, however, there has been separate assessment of the minerals and mineral rights, and the taxes have been paid by the defendant company, and not by the plaintiff or her predecessors.

This opinion was prepared with the expectation that it was to become the opinion of the majority, but afterwards those concurring in reversing the decree below came to a different conclusion, and a new opinion was concurred in by them, in which Judge LIVELY and I can not concur; and he and I have agreed to file this opinion as expressive of our views on the question involved. We think the case on which our

former decisions were predicated, so elaborately reviewed and sought to be differentiated by Judge Meredith, sustains the principles laid down in our former decisions, including the case which the opinion of the majority undertakes to overrule, and that that case became a rule of property which ought not to be disturbed.

Lively, *Judge,* concurs in this opinion.