792 S.E.2d 588

Gregory G. POULOS; Jason G. Poulos; Pamela F. Poulos; Shaun D. Rogers; Kevin H. Rogers; Derek B. Rogers; and T.G. Rogers, III, Defendants Below, Petitioners,

v.

LBR HOLDINGS, LLC, Plaintiff Below, Respondent.

No. 15–0907

Supreme Court of Appeals of West Virginia.

Submitted: October 5, 2016

Filed: October 26, 2016

Jennifer L. Shaver, Pro Hac Vice, Shaver Law Office, Abingdon, Virginia, Debra Kilgore, Burton, Kilgore & Lazenby, PLLC Princeton, West Virginia, Peter G. Glubiak, Pro Hac Vice Glubiak Law Office King Williams, Virginia, Larry D. Moffett, Pro Hac Vice, Daniel, Coker, Horton & Bell, P.A., Oxford, Mississippi, Attorneys for the Petitioners.

Michael W. Carey, David R. Pogue, Carey, Scott, Douglas & Kessler, PLLC, Charleston, West Virginia, Attorneys for the Respondent.

Howard M. Persinger, III, Persinger & Persinger, Charleston, West Virginia, Attorney for Amici Curiae, Natural Resource Partners, L.P.; National Council of Coal Lessors, Inc.; Piney Land Company; West Virginia, Land and, Mineral Owners' Association, and West Virginia Coal Association, Inc.

David B. McMahon, Charleston, West Virginia, Attorney for Amicus Curiae, West Virginia Surface Owners', Rights Organization.

John Kennedy Bailey, John Kennedy Bailey Law, Charleston, West Virginia, Attorney for Amicus Curiae, The West Virginia Royalty, Owners' Association.

Davis, Justice:

This appeal was brought by the Petitioners, Gregory G. Poulos; Jason G. Poulos; Pamela F. Poulos; Shaun D. Rogers; Kevin H. Rogers; Derek B. Rogers; and T.G. Rogers, III (collectively "Petitioners"), defendants below, from an August 19, 2015, order of the Circuit Court of McDowell County that granted judgment in favor of the Respondent, LBR Holdings, LLC ("Respondent"), plaintiff below. This case was tried before the circuit court, without a jury, to resolve ownership of coalbed methane ("CBM") under a 1938 deed. The assignments of error presented by the Petitioners can be distilled as follows: (1) the 1938 deed was not ambiguous; (2) CBM was a valuable resource in 1938; (3) the Coalbed Methane Wells and Units statute, W. Va. Code § 22–21–1 et seq., had no application to this case; (4) Respondent's expert testimony should not have been submitted; and (5) accounting claims should not have been dismissed.[1] After a careful review of the briefs, the record submitted on appeal, and listening to the argument of the parties, we affirm.[2]

## I.

### FACTUAL AND PROCEDURAL HISTORY

The dispute in this matter arises from the conveyance of real property and minerals in a 1938 deed. Specifically, the record indicates that, by deed dated May 27, 1938 ("the 1938 deed"), T.G. and Martha Rogers and Lloyd and Anne F. Rogers conveyed all their property interest in seven parcels of property

1. The Petitioners set out these issues in a confusing manner. We have reformulated the issues so that they can be succinctly resolved.

2. We acknowledge the valuable contribution of Amici Curiae Natural Resource Partners, L.P.; National Council of Coal Lessors, Inc.; Piney Land Company; West Virginia Land and Mineral Owners' Association; West Virginia Coal Association, Inc.; West Virginia Surface Owners' Rights Organization; and The West Virginia Royalty Owners' Association who submitted briefs to this Court.

(totaling approximately 3,800 acres) located in McDowell County, West Virginia, to Lon B. Rogers, except for "an undivided one-half interest in the oil and gas" under the property.

Through a series of transfers, the Respondent became the record owner of all of Lon B. Rogers' interests in the property, as well as all the Lloyd and Anne F. Rogers' interests in the property. Accordingly, the Respondent now owns a 75% interest in the oil and gas under the property, 100% of the coal and all other mineral interests under the property, together with certain portions of the surface of the property. The Petitioners are the record owners of the remaining 25% interest in the oil and gas under the property that was formerly owned by T.G. and Martha Rogers.

The record further shows that, beginning in 1997, EQT Production Company ("EQT") and GeoMet, Inc., and GeoMet Operating Company, Inc. (collectively "GeoMet"), have drilled and operated CBM wells on the property and generated royalties therefrom. There is no dispute that the Respondent is entitled to 75% of the CBM royalties. However, EQT and GeoMet have placed in escrow or otherwise withheld payment of 25% of the CBM royalties based upon uncertainty as to whether the CBM royalties are payable to the Respondent as the owner of all the coal and other mineral interests in the property, or to the Petitioners as the owners of a 25% interest in the gas in the property.

On November 21, 2013, the Respondent filed its complaint against the Petitioners, GeoMet, and EQT, seeking a declaration of ownership of all CBM on the property and an accounting of royalties from GeoMet and EQT. The Petitioners filed an answer, counterclaim, and crossclaims also seeking a declaration of ownership and an accounting of royalties. Subsequently, GeoMet was dismissed, and the CBM ownership issue was bifurcated from the accounting claims.

After denying the parties' cross-motions for summary judgment, the circuit court held a bench trial on November 12 and 13, 2014. The dispositive issue for determination at trial was whether CBM was considered "gas" for purposes of the Petitioners' reservation in the deed. The circuit court determined that there is a "distinct line between CBM and gas," and that the weight of the evidence at trial showed that CBM in 1938 was a dangerous, deadly hazard and a nuisance to be avoided and not a commercial resource. Additionally, the circuit court found that the commercialization of CBM in McDowell County, West Virginia, did not occur until the 1990's. Accordingly, the circuit court concluded that the predecessors of the Petitioners, based on the totality of the circumstances, did not intend the reservation in the 1938 deed to include an interest in the then-dangerous nuisance CBM. The circuit court also rejected a distinction between production rights under a lease, and ownership rights under a deed. Finding the two analogous, the circuit court held:

> [I]f a lease conveying the right to produce "gas" does not include the right to produce CBM absent specific language to the contrary or other indicia of the parties' intent, then deed language conveying or reserving "gas" does not include ownership of CBM absent specific language to the contrary or other indicia of the parties' intent.

The circuit court granted judgment in favor of the Respondent, memorializing its rulings in its order of August 19, 2015. This appeal followed.

## II.

## STANDARD OF REVIEW

■ With respect to reviewing the decisions of lower courts made in the context of bench trials, this Court has stated:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 1, *Public Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996).

With these standards governing our review of this case, we proceed to address the issues raised.

## III.

## DISCUSSION

We now turn to a discussion of the issues. First, we consider whether the 1938 deed was ambiguous. Second, we address whether CBM was a valuable resource in 1938. Third, we analyze the application of the coalbed Methane Wells and Units Statute, W. Va. Code § 22–21–1 *et seq.* Fourth, we review the testimony of the Respondent's expert witness. Fifth, we determine whether the accounting claims should have been dismissed.

### A. The Meaning of the Term "Gas" in the 1938 Deed Reservation was Ambiguous

■ The first issue we address is the circuit court's determination that, under the 1938 deed, the term "gas" was ambiguous with respect to whether it was intended to encompass CBM. Specifically, the 1938 deed provides:

[T]he parties of the first part [T.G. Rogers and Lloyd Rogers], ... do hereby grant and convey unto the party of the second part of [Lon Rogers], ... all their right, title and interest, in and to all the hereinafter described property, and being a two-thirds (2/3) undivided interest (the party of the second part owning the other one-third (1/3) undivided interest), said property being situated in McDowell County, West Virginia ... including all lands, minerals, rights, interests, easements, rents, issues and profits therefrom.... *But there is excepted from the above described property an undivided one-half interest in the oil and gas under said property* and the same is *reserved* to T.G. Rogers and Lloyd Rogers, parties of the first part, their heirs and assigns, *together with the usual and necessary rights of ingress and egress and drilling rights to explore, get and remove said oil and gas.*

(Emphasis added).

In its determination that the term "gas" was ambiguous under the deed, the circuit court relied upon the decision in *Energy Development Corp. v. Moss*, 214 W.Va. 577, 591 S.E.2d 135 (2003). *Moss* involved the issue of whether the term "gas" in a 1986 lease included CBM. In *Moss*, language in a lease provided that the lessee let, leased, and demised "all of the oil and gas and all of the constituents of each in and under the land." *Moss*, 214 W.Va. at 581, 591 S.E.2d at 139. There was no reference in the lease to CBM.

The circuit court in *Moss* determined that the reference to all "gas" in the lease was ambiguous with respect to CBM. Inasmuch as the circuit court determined the lease language to be ambiguous, testimony was taken regarding the knowledge the parties had about CBM during negotiations in 1986. The circuit court found that oil and gas leases that leased "all oil and gas," and which were entered into before commercial CBM wells had been permitted and drilled in West Virginia, and before West Virginia law contemplated CBM development, did not grant the right to drill into coal seams to produce CBM.

As the touchstone for analysis, the circuit court herein relied heavily upon our discussion within *Moss* wherein we declined to make a declaration about the general ownership of all CBM. *Moss*, 214 W.Va. at 595, 591 S.E.2d at 153. Instead, this Court rejected the "great temptation" urged on it to "wave a wand and declare coalbed methane to be either 'coal' or 'gas.'" *Moss*, 214 W.Va. at 585, 591 S.E.2d at 143. In *Moss*, we adopted a case-by-case approach focused on the intent of the parties at the time of making a conveyance.

More specifically, this Court in *Moss* rejected the argument that broad "all gas" language in the 1986 leases conveyed the right to develop the CBM. In affirming the circuit court, we entered into a detailed examination of the nature and history of CBM, reviewed the applicable law of contracts and deeds, considered the mixed results from other jurisdictions regarding the right to develop CBM, and analyzed the legislative enactments regarding CBM. We began in *Moss* by observing both the dangerous nature and value of CBM and explicitly rejected the urging of the parties to adopt a facially sim-

plistic finding that CBM was either "coal" or "gas." We indicated that CBM is methane in terms of chemical composition. In declining to answer whether CBM was "coal" or was "gas" for all purposes, we limited the question to

> whether a gas lease executed in 1986, before the widespread commercial production of coalbed methane in West Virginia, signed by a lessor who owned the land, coal, oil and gas, conveyed to the oil and gas lessee the right to develop the coalbed methane, absent any specific language on the issue.

*Moss*, 214 W.Va. at 585, 591 S.E.2d at 143 (footnote omitted). We answered the question in the negative. *Moss*, 214 W.Va. at 588, 591 S.E.2d at 146.

■ In holding that, "in the absence of specific language to the contrary or other indicia of the parties' intent, an oil and gas lease does not give the oil and gas lessee the right to drill into the lessor's coal seams to produce coalbed methane gas," we applied our case law regarding contracts generally and deeds particularly. *Moss*, 214 W.Va. at 588, 591 S.E.2d at 146. Specifically, we observed:

> "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. pt. 1, *Berkeley County Pub. Serv. Dist. v. Vitro Corp.*, 152 W.Va. 252, 162 S.E.2d 189 (1968).

Syl. pt. 3, *Moss*, 214 W.Va. at 579, 591 S.E.2d at 137. We also remarked: " 'A latent ambiguity, which does not appear upon the face of the document, however, may be created by intrinsic facts or extraneous evidence.' " *Moss*, 214 W.Va. at 585, 591 S.E.2d at 143 (quoting *Kopf v. Lacey*, 208 W.Va. 302, 307, 540 S.E.2d 170, 175 (2000) (per curiam) (citing Black's Law Dictionary 794 (5th ed. 1979))).

■ As to construction of a document after determining that it is ambiguous, we indicated that a court must endeavor to search for the intent of the parties, including marshaling extrinsic facts. *Moss*, 214 W.Va. at 586, 591 S.E.2d at 144 (citing *Fraternal*

*Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 101 n.7, 468 S.E.2d 712, 716 n.7 (1996)). We observed: " 'A deed will be interpreted and construed as of the date of execution.' Syl. pt. 2, *Oresta v. Romano Bros.*, 137 W.Va. 633, 73 S.E.2d 622 (1952)." Syl. pt. 4, *Moss*, 214 W.Va. at 577, 591 S.E.2d at 135.

The Petitioners strenuously argue that the case-by-case *Moss* approach is flawed and instead analogize this matter to that addressed in *Faith United Methodist Church and Cemetery of Terra Alta v. Morgan*, 231 W.Va. 423, 745 S.E.2d 461 (2013), wherein this Court essentially adopted a definition of the term "surface" drafted as a model law by the Uniform Law Commissioners. In so doing, we overruled *Ramage v. South Penn Oil Co.*, 94 W.Va. 81, 118 S.E. 162 (1923), which had held that the term "surface" as used in deeds and other instruments of conveyance was not definite and was therefore incapable of a definition affording universal application. Under *Ramage*, the term "surface" was presumptively ambiguous such that its meaning would be controlled by the nature and circumstances of the transaction. In adopting a uniform definition of the term "surface," this Court acknowledged that the goals of certainty of land titles and the avoidance of confusion in the area of land ownership were important. *Faith United*, 231 W.Va. at 431, 745 S.E.2d at 469.

It is contended by the Petitioners that the term "gas" must be treated in the same fashion as the term "surface" in *Faith United*. The claim is that there is no ambiguity because CBM is compositionally "gas," and, thus, it is included in the term "the gas." In short, "gas is gas." Such an interpretation, it is argued, would promote the goal of having terms with certain, definite meaning and would promote uniformity and consistency. It is suggested that *Moss* was impliedly overruled or superseded by *Faith United*. We disagree.

There are significant differences between the issues associated with the term "surface" and that of "CBM." The differences instruct why it is that *Faith United* did not overrule, or even criticize, *Moss* despite the extensive

analysis of prior case law and academic literature with respect to property and contract issues, including those of surface, coal, oil and gas, minerals, shale, timber, water, and others. For instance, the *Ramage* case, deciding that the term "surface" was presumptively ambiguous, was decided in 1923 at a time, as detailed in *Faith United*, when the history of the law demonstrates that courts were grappling with and developing various definitions of the term. By the 1930's, there was general jurisdictional agreement on the meaning of the term 'surface.' As the Court in *Faith United* stated: "Other courts had, however, by the 1930's, universally recognized that the fluctuating, expanding definitions of 'surface' did not reflect ambiguity, but rather showed the term being refined and gaining clarity and certainty." *Faith United*, 231 W.Va. at 440, 745 S.E.2d at 478. Moreover, it was stated: "Since the 1930's, the term 'surface' has largely been regarded as a word of clear meaning, unless that meaning is plainly altered by other language in the instrument of conveyance." *Id.* at 440, 745 S.E.2d at 478. Furthermore, we set out an extensive discussion indicating that not only had the *Ramage* approach been roundly criticized in several law review articles and rejected by other jurisdictions, but, additionally, this Court had long ignored, avoided, or sought to distinguish *Ramage*. *Faith United*, 231 W.Va. at 431–36, 745 S.E.2d at 469–74.

Plainly, the resolution reached in *Faith United* is simply not analogous to the *Moss* opinion of 2003 and the analysis of the meaning of the term "CBM." There is no uniformity amongst courts and scholars regarding whether the term "gas" as used in a deed or lease includes CBM. There was no uniformity at the time *Moss* was decided, and the lack of uniformity persists today. "Gas," with regard to CBM, unlike "surface," has not reached definitional refinement, clarity, and certainty. *Faith United*, 231 W.Va. at 440, 745 S.E.2d at 478. We recognized this in *Moss* wherein we discussed the cases from other jurisdictions regarding ownership of gas. We discussed the first and leading case wherein a court spoke on the question of CBM ownership. In *United States Steel Corp. v. Hoge*, 503 Pa. 140, 468 A.2d 1380 (1983), the Pennsylvania Supreme Court treated CBM as a

gas, but concluded that United States Steel had title to the coal strata including any CBM found within it. The *Hoge* court recognized the hazards associated with CBM and remarked: "Although the unrestricted term 'gas' was used in the reservation clause, in light of the conditions existing at the time of its execution [1920] we find it inconceivable that the parties intended a reservation of all types of gas...." *Hoge*, 503 Pa. at 149–50, 468 A.2d at 1384–85. Today, it remains the law in Pennsylvania that "such gas as is present in coal must necessarily belong to the owner of the coal" such that "the coal owner may mine his coal, extract the gas from it, or both." *Hoge*, 503 Pa. at 147–48, 468 A.2d at 1383–84.

Likewise, we discussed the complex decision of the Alabama Supreme Court in *NCNB Texas National Bank, N.A. v. West*, 631 So.2d 212 (Ala. 1993), which held that the coal owner owned the CBM when it is bound within the coal seam, and the gas owner owns CBM when it migrates out of the coal. The rule remains the same in Alabama.

Additionally, in *Moss* this Court explicitly addressed a United States Supreme Court case considering CBM in the context of federal or Indian lands as well as federal statutes and regulations. We agreed with the description of CBM as a gas existing "in coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas adsorped on the solid surface of the coal...." *Amoco Prod. Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 873, 119 S.Ct. 1719, 1724, 144 L.Ed.2d 22 (1999). The *Amoco* decision concluded that the CBM did not belong to the owner of the coal. This Court distinguished *Amoco* on the basis of the Congressional statutes and limited reservations driven by the federal statutory scheme which dictated the result.

In *Moss*, we also considered *Newman v. RAG Wyoming Land Co.*, 53 P.3d 540 (Wy. 2002), which analyzed the intent of the parties in 1968 in concluding that a deed that conveyed coal and reserved "all oil, gas and other minerals" did not convey the CBM to the coal owner, but, rather, reserved it for the grantor. We also noted that Montana

reached a similar conclusion that a grant of "all coal and coal rights" did not convey the coalbed methane. *Carbon Cnty. v. Union Reserve Coal Co., Inc.*, 271 Mont. 459, 898 P.2d 680 (1995). This Court observed that the Wyoming and Montana decisions turned on an inquiry regarding intent and circumstances at the time the instruments were executed.

■ We also acknowledged that the State of Virginia had a case pending at the time we issued *Moss*. In 2004, the Supreme Court of Virginia held that surface owners who had conveyed all the coal in and under their land retained the right to the CBM. *Harrison–Wyatt, LLC v. Ratliff*, 267 Va. 549, 593 S.E.2d 234 (2004). The Court in *Harrison–Wyatt* found persuasive the *Amoco* discussion to the effect that the common conception of coal when Congress acted in the early 1900's was as a solid rock substance and that a solid rock would not include gas that escaped from coal during the mining process. *Harrison–Wyatt*, 267 Va. at 556, 593 S.E.2d at 238.[3] As we indicated in *Moss*, the *Amoco* opinion is driven by federal ownership and regulatory schemes that primarily were concerned with promoting the country's primary energy source, which was coal.

Several other courts have grappled with the issue since *Moss* was decided. In *Continental Resources of Illinois, Inc. v. Illinois Methane, LLC*, 364 Ill.App.3d 691, 301 Ill. Dec. 887, 847 N.E.2d 897 (2006), the court held that "the bundle of property rights associated with the coal estate also includes the right to reduce to possession any gas trapped within the coal itself so long as the gas remains within that coal until the time of its capture." *Continental Resources*, 364 Ill. App.3d at 695, 301 Ill.Dec. at 892, 847 N.E.2d at 902. It is noteworthy that in *Cimarron Oil Corp. v. Howard Energy Corp.*, 909 N.E.2d 1115 (Ind. Ct. App. 2009), the court, while declining to adopt a broad rule regarding general CBM ownership, found that "public policy would militate toward considering CBM to be part of the coal bed." *Cimarron Oil*, 909 N.E.2d at 1124. A Kentucky court held that "the owner of the veins and beds of coal possesses the right to capture any CBM within those veins and beds." *Bowles v. Hopkins Cnty. Coal, LLC*, 347 S.W.3d 59, 65 (Ky. Ct. App. 2011) (grantor in 1924 would not have intended to reserve ownership in a valueless and dangerous waste product). We recognize that these decisions avoid declarations of ownership.

In summary, our review of the case law shows that, after the seminal decision in *Hoge*, some courts have concluded that the coal owner owns the gas existing in the seam, others have held that the gas owner owns the gas because it is gas, and others have avoided declaring ownership, but appear to lean toward the coal owner. With the exception of Virginia, in all cases, the analysis involved determining the intent of the parties.

In the same vein, we also observe that in an online article, the author posed the question whether the reasoning in *Faith United* should apply to ownership of CBM. Jason Turner, "Scratching the Surface: "Uncertainty and Confusion" in Faith United Methodist v. Morgan, 17 W. Va. L. Rev. Online 10, http://wvlawreview.wvu.edu/west-virginia-law-review-online/2015/01/16/scratching-the-surface-uncertainty-and-confusion-in-faith-united-methodist-v-morgan (Jan. 16, 2015). The author recognized that many areas of law could benefit from efforts at precise meaning and certainty. However, the analysis in this complex situation, where the existence of CBM was commonly known but the instruments of conveyance did not explicitly address it, compelled the conclusion that the reasoning of *Faith United* should not apply to CBM. Mr. Turner's analysis is in accord with the other commentators who have written on the subject as related to West Virginia. Our analysis is informed by the scholarship regarding the nature of CBM and the

**3.** We recognize that the record establishes that, in reliance upon *Harrison–Wyatt*, the Circuit Court of Buchanan County, Virginia, granted summary judgment for the Petitioners herein. The Supreme Court of Virginia denied a petition for appeal filed by the Respondent herein. The circuit court here correctly concluded that West Virginia law controls the outcome of the case. It is well-established that real property law issues are controlled by the law of the state within which the subject property is situated. *See Keesecker v. Bird*, 200 W.Va. 667, 679–80, 490 S.E.2d 754, 766–67 (1997).

ownership question which we now briefly discuss.

In 1941, Professor Williams published the first, and, for some thirty years, the only discussion of the legal issues surrounding the presence of gas in coal. C.C. Williams, Jr., *On Leasing Gas from Coal Seams*, 47 W. Va. L.Q. 211 (1941). Professor Williams remarked on the necessity of elaborate arrangements for ventilating the gas in order to safely mine coal. He observed that the gas problem is solved by "blowing it all off into the air." *Id.* at 212. Professor Williams remarked that the question of who has title to gas contained within the coal when the interests are severed is not readily answered. After creating a narrow hypothetical and identifying a number of approaches using common law theories, Professor Williams concluded that the issue of ownership resolves itself down to a question of policy. With respect to a choice for a uniform rule between a surface proprietor and a coal operator, Professor Williams was of the opinion that sound policy favors the owner of the coal. *Id.* at 227.[4]

In 1978, Professor McGinley published an article regarding the ownership of gas found in coal deposits. Patrick C. McGinley, *Legal Problems Relating to Ownership of Gas Found in Coal Deposits*, 80 W. Va. L. Rev. 369 (1978). Remarkably, little had changed in the intervening decades since Professor Williams tackled the complex question of ownership of CBM. After setting forth a number of legal and practical problems that arise in the context of severed rights to coal and to gas if the owner of gas is declared to own the CBM and analyzing a number of possible scenarios for addressing the ownership of CBM, Professor McGinley concluded that a case-by-case analysis of the instrument

of conveyance and the intentions of the parties was the sound approach for determining CBM ownership. As he remarked:

> Courts applying common law principles are indeed capable of adjudicating the question of coalbed gas ownership. Few tenets of the common law are better established than the proposition that when viewed in light of all the circumstances, the intent of the parties to a contract, lease or deed should prevail. Courts applying this traditional rule should have little problem concluding that the grantee or lessee of coal purchased the right to, as well as the responsibility for coalbed gas.

*Id.* at 395.

Also worthy of note is the proposal by Professor Lewin and others in 1992 for a legislative solution to the ownership question that would establish a shared ownership of CBM between the coal owners and the gas owners. Jeff L. Lewin, Hema J. Siriwardane, Samuel J. Ameri, and Syd S. Peng, *Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane*, 94 W. Va. L. Rev. 563 (1992).[5] Significantly, regarding the indeterminacy of CBM ownership at common law, Professor Lewin remarked as follows:

> Whenever coal or gas rights have been severed separately, the ownership of CBM at common law is uncertain. In analyzing the ownership question, a court might take any one of a variety of approaches. The conflicting legal principles and the existing precedent from West Virginia and other jurisdictions do not point toward any one of these solutions as necessarily or even probably correct, so a court could adopt

---

4. While recognizing various geological and chemistry issues regarding where the gas was in terms of seam, or source, or similarity to natural gas, Professor Williams was forward-thinking in speculating that science and experimentation might provide for drilling in advance of mining as a safety measure and allowing for the possibility of marketing. He indicated that the subject was worthy of exploring legally due to a finding of a gas horizon in the Pittsburgh coal seam in the northern part of West Virginia.

5. Professor Lewin laid out a number of common law approaches to the ownership question as well as arguments for and against each approach. In summary, the possible approaches included determining that CBM is encompassed within any grant or reservation of gas, determining that CBM is encompassed within any grant or reservation of coal, determining ownership based on priority of severance, case-by-case analysis of the conveyances and the intention of the parties, successive ownership related to pre and post mining, and mutual simultaneous rights. None of the approaches were viewed as optimal.

any one of the approaches described below and not be "wrong" in any objective sense. *Id.* at 614.

 Our discussion of the cases, the scholarship,[6] and the legislative proposals[7] is not meant as a mere academic exercise. Rather, our purpose is to highlight the longstanding challenges when considering the nature of CBM and the question of ownership. After reviewing our case law, the jurisprudence as developed elsewhere, and the commentators, we are not persuaded that adopting anything other than a fact-based, case-by-case approach as articulated in *Moss* is correct. We acknowledge that simple rules easily applied is a desirable path. However, there are some issues that are not easily disposed of with bright-line rules. This seems particularly so when the application of a declared simple rule operates retrospectively. Dictionary, encyclopedic, or even scientific definitions of terms such as "coal" and "gas," while superficially appearing to provide the merit of simplicity, afford no comfort in determining ownership of coalbed gas in the setting of severances made at a time when CBM was a dangerous and deadly waste product that a coal operator had the duty to remove from the mines primarily by "blowing it off" into the atmosphere. We further observe that inasmuch as we are not informed of a deluge of disputes, the experience since issuing the *Moss* opinion has not resulted in "havoc, chaos or instability." Case-by-case resolution is the policy favored by the Legislature as expressed in the Coalbed Methane Wells and Units Statute, W. Va. Code § 22–21–1 *et seq.*, when it refused to resolve the ownership question, instead encouraging dispute resolution and judicial adjudication of disputes.

 Our review makes plain that, in following and applying the principles of *Moss*, the circuit court did not err in finding the reservation of "the oil and gas" in the 1938 deed ambiguous and therefore denying summary judgment. As our entire analysis demonstrates, chemical composition or "gas is gas—and coalbed methane gas is gas" is not the only defining characteristic. The circuit court correctly applied our rule providing: "Deed reservations are strictly construed against a grantor and in favor of a grantee." Syl. pt. 2, *McDonough Co. v. E.I. DuPont DeNemours & Co., Inc.*, 167 W.Va. 611, 280 S.E.2d 246 (1981). Additionally, the circuit court correctly applied our well-settled law stating: "Where there is ambiguity in a deed, or where it admits of two constructions, that one will be adopted which is most favorable to the grantee." Syl. pt. 5, *Cottrill v. Ranson*, 200 W.Va. 691, 490 S.E.2d 778 (1997). The circuit court also properly considered *extrinsic evidence in terms of general usages of the gas business and the usage or customs followed in order to determine the parties' intent at the time of the making of the reservation in 1938. See Moss,* 214 W.Va. at 585–87, 591 S.E.2d at 143–46. Moreover, we observe: "In order for a usage or custom to affect the meaning of a contract in writing because [it was] within the contemplation of the parties thereto, *it must be shown that the usage or custom was one generally followed at the time and place of the contract's execution.*" Syl. pt. 7, *Moss,* 214 W.Va. 577, 591 S.E.2d 135.

**6.** One commentator suggested that West Virginia should assign ownership of CBM to the coal owners so long as it remained in the coal seam. Michelle D. Baldwin, *Ownership of Coalbed Methane Gas: Recent Developments in Case Law,* 100 W. Va. L. Rev. 673 (1998). One author, post-*Moss* concluded that the controlling factor is the intent of the parties, and in attempting to discern intent, courts should presume parties did not intend to include the right to CBM in leases executed prior to CBM becoming commercially produced. The presumption can be rebutted with evidence. S. Ryan White, *Who Owns Coalbed Methane in West Virginia,* 107 W. Va. L. Rev. 603 (2005).

**7.** We are unaware of the adoption of the Lewin legislative solution in any jurisdiction. In 2015, another commentator suggested a proposal for legislatively mandated production of CBM which would provide that the coal owner owns the CBM when it is in the coal seam, but does not once it migrates outside the coal seam. Michael Yanda, *Coalbed Methane: A Proposal for Mandated Production,* 9 Appalachian Nat. Resources L.J. 51 (2014–15). Also, Representative Nick J. Rahall attempted to solve the ownership question when he unsuccessfully introduced legislation that would divide the ownership of CBM into three equal shares among the owners of the surface, coal, and gas rights. H.R. 1078, the National Coal and Extractive Energy Act of 1991, 102d Cong., 1st Sess. (1991).

### B. Based Upon Usage and Custom, CBM Was Not a Valuable Resource in 1938

The next issue we address is the Petitioners' contention that CBM was a valuable resource in 1938 and that they presented sufficient evidence to establish this fact. The Respondent contends that it presented sufficient evidence to prove that CBM was not a valuable resource at the time the deed was made. We will examine the evidence the parties presented on this issue separately.

#### 1. The Petitioners' evidence that CBM was a valuable resource in 1938.

Dr. James Rimstadt ("Dr. Rimstadt"), a geochemist and professor emeritus at Virginia Tech, testified as an expert on behalf of the Petitioners. Dr. Rimstidt testified regarding his view that the term coalbed methane is a vague concept because it excludes other possible gases that might be generated from a coal deposit. Dr. Rimstidt explained that natural gas consists of a wide range of compositions in certain specific compounds. He believes that it is "more reasonable" to call the gas found in the coalbed a natural gas. Additionally, Dr. Rimstidt explained that he believes the nature of coalbed methane is problematic because of a lack of distinction made between resources and reserves. Basically, according to Dr. Rimstidt, a resource is any mineral, gas, or petroleum commodity that is in the ground that is potentially valuable. Within the class of resources, there is a sub-unit of mineral commodities that are known to exist and that are economic to produce at the time of determination. This sub-unit of mineral commodities makeup the reserves. Gas in the coalbed in 1938 should be considered a resource. Such gas was not a reserve because it was not economically mineable. The essence of Dr. Rimstidt's expert testimony was that, from a scientific point of view, there is no reason to distinguish, classify, or consider CBM differently from any other natural gas. Dr. Rimstidt did not discuss the history of CBM and did not dispute testimony from the Respondent's expert that CBM was historically regarded as a dangerous nuisance to be avoided and released through ventilation rather than developed for profit. Nor did he dispute the testimony that CBM production was not a common practice in 1938.

Mary Behling ("Ms. Behling") also testified as a witness called by the Petitioners. Ms. Behling is a forty-two year employee of the West Virginia Geological and Economic Survey ("WVGES"). She holds multiple positions including that of Associate Director, head of Information Services, and interim head of the Oil and Gas Program. She has a bachelor's and master's degree in geology as well as two years of doctoral studies. The testimony of Ms. Behling was offered for the purpose of introducing and using the WVGES oil and gas database to demonstrate that there were indications that gas was being produced from coal seams in West Virginia in and prior to 1938. As we will discuss below, there were some challenges with the information from the database as it pertains to a pre–1960's era.

The Petitioners contend that the extrinsic evidence proved that in and prior to 1938, CBM was known to be a valuable resource, even in light of its hazardous properties, and was being produced in significant quantities. They set out four arguments. First, whether the parties knew the existence of or the value of CBM is irrelevant to whether there was an intent to convey or reserve CBM. Second, a resource does not have to be commercial at the time of a deed's execution in order to be conveyed or reserved. Third, there was no evidence regarding what would be commercial in terms of production of CBM in 1938. Fourth, the circuit court ignored evidence that CBM was a known economic resource in 1938. In support of these arguments, the Petitioners rely heavily on publications they assert confirm CBM production in West Virginia prior to 1938 and on the oil and gas database developed by the WVGES.

The evidence relied upon by the Petitioners includes a 1937 report that provided an analysis of gas producing fields and formations for the purpose of securing information about natural gas as an economic resource.[8] The term "natural gas" was defined in the

---

8. Paul H. Price and A.J.W. Headlee, *Physical and Chemical Properties of Natural Gas of West Virgi-* *nia,* West Virginia Geological Survey (1937).

report as "any gas issuing from the earth's crust through wells drilled with intent of finding oil, gas, water, etc., in the State of West Virginia." In a chapter sub-section of the report entitled "Gas from Various Coal Horizons," the authors discuss several wells said to be producing from coal seams including three wells in Wetzel County said to be from the Pittsburgh Coal seam, one from near Morgantown perhaps from the Kittanning Coal seam, and another from the Freeport Coal seam. However, as discussed by the Respondent's expert, the Pittsburgh and Freeport Coal seam are not found in McDowell County, West Virginia. The testimony of the Respondent's expert emphasized that these coal seam wells amount to but a handful of the 64,000 conventional gas wells drilled in West Virginia as of 1938.

Also relied upon is a report that references one well in Wetzel County struck in 1886 in the Pittsburgh Coal seam that was said to be a valuable flow and furnishing a portion of supply for the village of Hundred.[9] The discussion is somewhat confounding as it is specifically noted that the drilling targeted the Gordon Sand. Thus, it is entirely unclear that the flow was coming from the coal seam.

Additionally introduced below was a 1976 report discussing a well drilled in 1905 that produced gas from the Big Injun and Gordon Sands.[10] The original driller's log noted Pittsburgh Coal seam, partial plugging operations in 1931 with gas issuing suggested that it was from the coal seam, and continued productivity until 1968 all support the argument that there was commercial production of CBM. On the other hand, the Respondent points to portions of the report that observe CBM production being in its infancy in 1976 consistent with its expert's testimony.

In continued reliance on historical publications, the Petitioners argue that a 1943 article supports their position.[11] The authors stated that the term "natural coal gas" is applied to the gas which occurs naturally in coal to differentiate it from other natural and artificial gases. The article noted the explosion hazards of natural coal gas and suggested that technology could be developed to recover the natural coal gas so as to make it economically feasible to remove.

Finally, with respect to publications said to support their argument, the Petitioners cite to a 1994 document discussing the history of methane drainage for safety purposes and explaining that ventilation was the primary method for controlling methane in underground coal mines.[12] In terms of history of gas production from coal seams, the author indicated that the potential for using horizontal and vertical boreholes to drain gas from coal mines was recognized in the early 1900's. The author observed that the first attempt to remove gas by use of pipelines took place in Great Britain some 200 years earlier and was widely used in European coalfields in the 1940's. The potential value for coalbed methane as a recoverable resource was noted in that its recovery "might conceivably be a profitable undertaking."

**2. The Respondent's evidence that CBM was not a valuable resource in 1938.** The Respondent called Fon Rogers, II ("Mr. Rogers"), who is its manager and also the son of Lon B. Rogers, who was the grantee in the 1938 deed. Mr. Rogers testified that the first gas lease entered into regarding the property was in September 1947. The 1947 lease contained language to the effect that the coal was the more valuable estate. It further recognized that any oil, gas, or gasoline operations were not to interfere with the coal operations. An additional requirement provided that "when any well is drilled through any workable seam of coal, it is to be so cased and protected as to prevent gas, oil or water from the well escaping into the coal." Additionally, Mr. Rogers testified about a 1957 amendment to the 1947 lease which reaffirmed the dominance of the coal estate. According to Mr. Rogers, the first

9. I.C. White, West Virginia Geological Survey (1904).

10. James G. Tilton, *Gas from Coal Deposits in Natural Gas from Unconventional Geologic Sources*, National Academy of Sciences (1976).

11. A.J.W. Headlee and Paul H. Price, *Natural Coal Gas in West Virginia*, (1943).

12. William P. Diamond, *Methane Control for Underground Coal Mines*, Bureau of Mines Information Circular (1994).

time any interest was expressed in CBM was by Island Creek Coal in 1989 or 1990. That is when Mr. Rogers learned of any potential for CBM to be used as a profit-generating resource on the property. Moreover, Mr. Rogers testified he was unaware of any project in McDowell County prior to 1993 involving CBM development.

Over the objection of the Petitioners, the Respondent presented the expert testimony of Dr. Nino Ripepi ("Dr. Ripepi"), a mining engineer and Assistant Professor in the Department of Mining and Minerals Engineering at Virginia Tech. Dr. Ripepi teaches graduate level courses regarding the historical development of CBM production in the United States. He has worked in the energy industry where his tasks included planning and testing CBM degasification wells. Additionally, Dr. Ripepi has been a research scientist involved in the collection and analysis of production data for fifty percent of all CBM wells in the Central Appalachian Basin, which includes southern West Virginia.

Dr. Ripepi testified extensively regarding the nature of CBM, production and commercialization of CBM, the differences between CBM and conventional gas, technology related to CBM, and various studies and reports about CBM. According to Dr. Ripepi, historically, CBM was regarded as a nuisance and significant hazard for underground coal mining such that it was removed from the coal mines through ventilation practices in order to protect the health and safety of miners. The United States Bureau of Mines was created in 1910 as a response to a number of catastrophic mine disasters caused by methane explosions. There had been several methane related disasters resulting in significant loss of life due to coal mine explosions including the Monongah, West Virginia, explosion that killed over 360 miners in 1907. Dr. Ripepi explained that the Bureau of Mines was a research agency and that a primary goal was to make the mines safer by eliminating the methane. In that regard, the Bureau of Mines developed ventilation practices to eliminate or reduce methane by releasing it from the coal into the atmosphere. Methane was vented from the mines as a common industry practice until the 1970's when the

first production of CBM began in the United States. The Bureau of Mines developed best practices for mine ventilation which called for diluting the methane with fresh air to a nonexplosive degree and releasing the hazardous gas to the atmosphere. Nevertheless, there were still many accidents resulting from CBM. Accordingly, in the 1950's the Bureau of Mines conducted research and pilot projects in an effort to degassify or drain CBM off the coal seams through the use of wells. In the early 1970's, the Bureau of Mines conducted tests in Alabama to determine if it was feasible to drill CBM vertical wells through coal zones and pump water off the coal. The study showed that it was feasible to decrease the methane, and thereby the dangers during mining, and recover methane that would otherwise be wasted to the atmosphere.

According to Dr. Ripepi, in 1980 the Geological Survey of Alabama, based upon the data from the Bureau of Mines study, issued the first CBM permit in the United States to drill and complete a CBM well in the Black Warrior Basin. The next area to begin developing CBM in the 1980's and 1990's, with substantial federal tax credit support, was that of the San Juan Basin along the Colorado and New Mexico borders.

Significantly, Dr. Ripepi testified that the first commercial CBM well in the Central Appalachian region (including southern West Virginia) was drilled and completed in 1988 in Dickenson County, Virginia, by Equitable Gas. The first producing CBM wells in Southern West Virginia commenced in 1995. Dr. Ripepi buttressed his testimony and opinions regarding commercial production of CBM with numerous reports, studies, and documents. The materials discussed by Dr. Ripepi included publications from the Bureau of Mines, the United States Environmental Protection Agency, the United States Geological Survey, the West Virginia Geological Survey, and the National Academy of Sciences.

The testimony of Dr. Ripepi also included a technical explanation of the difference between CBM and conventional natural gas. The primary difference is in how the two are contained within and flow through source

rock. Coal is a unique rock consisting of a matrix of the solid coal and an interconnected system of cleats that run throughout. Within the coal matrix there are separate, unlinked tiny spaces known as micropores. Unlike conventional gas, CBM is adsorped, or adhesively attaches, on the surface of the micropores within the matrix. About 98% percent of the methane contained in the CBM is adsorbed in the coal matrix. It has a monolayer around the micropore system and chemically clings to the outside of that surface. However, in a conventional sandstone formation with natural gas, Dr. Ripepi explained, the gas is not adsorbed into the mineral. Rather, it is held as free gas predominantly confined under pressure into a network of joints or spaces.

In a conventional sandstone system, when a hole is drilled, it is "like putting a straw in a balloon" in terms of producing gas. However, if one drills into a deep coal seam, it is unlikely to produce significant amounts of gas because there is water within the cleat system which holds the pressure back on the adsorbed molecules. The water must be removed in order to lower the pressure and allow the CBM to migrate through the coal matrix into the cleat system.[13]

Another important difference between conventional gas and CBM as outlined by Dr. Ripepi is that Central Appalachian coal has lower permeability, which is the ability to flow through rock. Thus, it takes significantly longer for CBM to flow through cleats in coal than it does for conventional natural gas to flow through a sandstone system. Due to various considerations associated with the low permeability of the coal, two techniques are used to produce commercial quantities of CBM. One technique is hydraulic fracturing which involves using high pressure liquids to create fractures which extend thousands of feet into the coal seam, thereby increasing the area of drainage for a well and allowing more CBM to be produced. The second technique is horizontal drilling through the coal

seam itself. It is more expensive and less common than hydraulic fracturing and primarily is used with isolated coal seams that are to be mined in the near future. The first known hydraulic stimulation of a coalbed occurred in 1959, and the technique of horizontal drilling began in the late 1980's. Previously, natural gas producers used open hole and casing perforation wells, which would not produce commercial quantities of CBM.

In summary, the focus of Dr. Ripepi's testimony was directed at explaining his opinion that CBM was historically viewed as a dangerous hazard to be vented into the atmosphere and was not a commercial resource. The testimony was also directed at establishing that while CBM is a gas, it has characteristics that distinguish it from conventional gas.

**3. The circuit court credited the evidence presented by the Respondent on the issue of whether CBM was a valuable resource in 1938.** It is clear from the verdict reached in this case that the circuit court was not persuaded by the Petitioners' evidence on the issue of CBM being a valuable resource. Nor are we persuaded.

The Petitioners' contention that its publications evidence demonstrates that there was "voluminous evidence" confirming CBM production prior to 1938 overstates the case. At best, the publications reinforce the undisputed fact that CBM existed and that people were well aware of it and the hazards it presented. However, the publications considered as a whole identify only a handful of wells for which no further production data or information is known. The identification of the wells is to the effect that they are unusual. Moreover, the small numbers of wells are located in northern West Virginia, which is geologically distinct from southern West Virginia and McDowell County. Other evidence identified by Dr. Ripepi such as depth infor-

---

**13.** Amicus West Virginia Surface Owners' Rights Organization points out that production of CBM imposes significant different and additional burdens on surface lands than conventional gas production in terms of the requirement for larger numbers of wells and well pads and the tremendous volume of water that must be pumped out. Newer technologies also create issues with re-spect to changing and/or polluting the water table. This places into issue the question of what expectations the party to a conveyance had when the "usual and necessary rights of ingress and egress" for exploring, getting, and removing gas is contained within the conveyance language. This issue was addressed by Respondent only in passing.

mation and ethane and propane content suggests that the wells may not have produced gas from coal at all, but rather from over—or underlying sandstone. Finally, the authors appear to have been addressing future hopes as to potentially developing technology to commercially produce CBM while advancing mine safety.

We also believe that the Petitioners ask too much of the WVGES gas well records when they assert that the evidence from the database establishes that more than sixty wells were producing gas from coal seams in West Virginia between 1865 and 1946. As the Respondent addressed with the circuit court, as to each well, there are various issues that place into question the reliability of the database with respect to in and pre–1938 data. Generally, the database and portions thereof were shown to be replete with inaccuracies, no records regarding production, no information as to depth or formations where the gas was found, assumptions that were not supported by source documents, and outright mistakes. The reliability issues with the oil and gas database are understandable in that the database was not created until 1966. For some of the information, there is no supporting documentation. Moreover, operators were not required to report information such as production volume prior to 1979. Ms. Behling testified that, prior to 1979, she does not know whether gas was produced from wells. The data entry was done by employees of WVGES who reviewed the limited records available and made entries based upon interpretations and judgments.

Additionally, it was shown that, of the wells identified from the database, only forty-seven were active prior to 1938. Of those, thirteen wells produced a "pay" [14] of some sort but were located in Wetzel, Marshall, and Mason counties. Of the twenty-three wells identified to be in McDowell County, all were drilled to shallow depths within the community of Welch and could not have been commercial wells. For all but one of those twenty-three wells, the database indicates that they were drilled in the Pennsylvania System. That does not demonstrate that they were drilled into coal because, as the evidence showed, the Pennsylvania System contains shale, sandstone, and limestone in addition to coal. Only one of those well documents contains a suggestion that coal was encountered. According to the testimony of Dr. Ripepi, the shallow depth of the wells and the close proximity to one another in Welch indicates that they were shallow wells used for houses. They could not have been commercial wells. In any event, there are no records indicating that the wells produced gas from coal.

A review of the oil and gas database information compels the conclusion that there is very little information that would assist in determining whether the gas was from coal prior to 1990. Indeed, as Ms. Behling testified: "[c]oalbed methane was not on our radar until the early 1990s." The WVGES did not start "paying attention" to production from coal until a study in that time period identified CBM as a potentially important source of energy.[15]

We acknowledge that in connection with their arguments based on the publications and the database, the Petitioners also take exception to the circuit court's reliance on the testimony of Dr. Ripepi regarding the number of wells it takes to make CBM production commercial. Specifically, it is asserted that the twenty field modern standard articulated by Dr. Ripepi may be different than the standard in 1938. In challenging Dr. Ripepi's commercial definition, reliance is made on the fact that some of the wells identified in the database used the term "pay." However, as discussed, the database contains shortcomings. Additionally, Ms. Behling could not confirm anything other than a static representation of the amount of gas measured on the date the well was completed and that "pay" could not be interpret-

---

14. The term "pay" as used in the WVGES records was said to mean that the well produced more than 25,000 cubic feet of gas per day. However, the "pay" notation relates only to the data at the date and time the well was completed.

15. The Petitioners contend that Ms. Behling's testimony that CBM was not on the radar until the 1990's was taken out of context. They assert that, historically, the WVGES records' use of the terms "gas," "methane," or "CBM" do not indicate a difference in substance or origin.

ed to mean that commercial production took place since there were no production records.

In a companion argument, the Petitioners contend that the uncontroverted evidence established that CBM is not chemically distinguishable from natural gas, is created by the same geochemical processes as gas formed in strata other than coal, and exists in the same basic natural states as conventional methane gas. Thus, it is argued that the circuit court erred when it concluded that there was a "distinct line" between CBM and gas. We recognize that CBM is gas. Our analysis here and in *Moss* makes plain that while CBM is a gas, CBM is unique in its characteristics with respect to coal, which creates specialized policy considerations. *Moss*, 214 W.Va. at 585, 591 S.E.2d at 143. The testimony at trial regarding the process of adsorption or clinging of the CBM to the micropores in the coal matrix supports the "distinct line" analysis of the circuit court. The analysis also is supported by the case law, commentators, and statutory schemes that the circuit court relied upon to identify the distinction between CBM and conventional or natural gas.

The Petitioners also argue that the circuit court's analysis results in questions of ownership hinging on the volume of resource production and on advances in technology. We reject that characterization. The evidence adduced regarding production and technology was for the purpose of considering the intent of the parties in 1938 when the deed was executed. CBM has unique qualities, characteristics, and history that are not transferrable to other resources. Moreover, the evidence established that the existence of CBM was well known, and it was commonly considered a deadly hazard for which the general custom and usage was to get rid of it. Thus, given that evidence, it is difficult to imagine that there would be an intent to reserve an interest in a hazardous by-product.

In considering the record as a whole, we perceive no clear error with respect to any of the circuit court's rulings on the issue of CBM not being a valuable resource in 1938.

### C. The Coalbed Methane Wells and Units Statute

The Petitioners assert that the trial court erred in relying on the Coalbed Meth-

ane Wells and Units statute, W. Va. Code § 22–21–1 *et seq.*, because it had no bearing on the issue since the statute addresses production rather than ownership. It is argued that the statute did not become law until 1994 and thus could not have affected the intent of the parties. The Respondent contends that the Legislature passed a standalone statute regulating CBM independently from conventional gas thereby indicating that there is a distinction between CBM and gas. Moreover, the Respondent states that the passage of the statute lends support to Dr. Ripepi's testimony that CBM was historically considered a dangerous waste product and that production did not begin in southern West Virginia until the 1990's.

In *Moss* this Court recognized and discussed at some length the comprehensive statutory scheme. We explicitly found it "worthy of note" that the statute "completely avoids and eschews any attempt at deciding ownership of coalbed methane." *Moss*, 214 W.Va. at 594, 591 S.E.2d at 152. The circuit court did not exclusively rely on the statute. Nor did the circuit court suggest that the statute was determinative of the intent of the parties to the 1938 deed. Rather, the circuit court considered the statutory scheme as but a piece of the puzzle in concluding that the "great weight of research, historical data, Dr. Ripepi's testimony, . . . and case law including *Moss*" instruct that there is a "distinct line between CBM and gas." Accordingly, we find that the circuit court properly considered the existence of the statute, together with other evidence, in reaching the conclusion that there is a distinction between CBM and conventional gas.

### D. The Admissibility of Expert Testimony

With respect to the testimony and opinions of Dr. Ripepi, the Petitioners also assign as error the circuit court's admission of his testimony as a qualified expert. It is asserted that Dr. Ripepi's testimony was neither relevant nor reliable insofar as it related to gas production in 1938. The argument is that while Dr. Ripepi may be qualified to testify as to the current state of modern CBM production and industry prac-

tices, his testimony as to practices in 1938 was speculative. In response, the Respondent points to Dr. Ripepi's extensive education and experience with CBM. The Respondent notes that the record is replete with publications and other witness testimony that support the conclusions of Dr. Ripepi.

■ This issue is governed by Rule 702 of the West Virginia Rules of Evidence which, in part, provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In short, in order to offer expert testimony, a witness must be qualified, and the testimony must be relevant and reliable. *See generally Gentry v. Mangum*, 195 W.Va. 512, 519, 466 S.E.2d 171, 178 (1995).

We need not dwell on this issue. A plain review of the evidence compels the conclusion that specialized knowledge regarding CBM assists the trier of fact. Undoubtedly, the knowledge, skill, experience, training, and education of Dr. Ripepi all qualify him as an expert with respect to CBM. We specifically find that his academic credentials, including teaching a graduate level course in the Mining and Minerals Engineering Department at Virginia Tech about the history of CBM production in the United States, renders him well-qualified to address the historical development matters regarding CBM at issue here. Additionally, Dr. Ripepi's academic credentials are enhanced by practical field work regarding CBM and extensive research experience involving CBM wells in the Central Appalachian Basin. We reject the contention that Dr. Ripepi's conclusions were subjective, unreliable, and unsupported. Indeed, Dr. Ripepi's testimony largely was uncontroverted. To the extent that historical

publications and documents were relied upon by the Petitioners, they were distinguished or explained by Dr. Ripepi. We find that Dr. Ripepi's testimony was both relevant and reliable. Accordingly, there was no error in the admission of expert testimony by Dr. Ripepi.

### E. Dismissal of the Accounting Claims

■ The Petitioners also assign as error the circuit court's dismissal of the case in its entirety. The assertion is that the circuit court neglected to resolve the accounting issues, which had been bifurcated from the question of ownership. While it is accurate that the issues were bifurcated, only the party prevailing on the ownership claim is entitled to an accounting. Inasmuch as the Respondent prevailed on the ownership issue, the Petitioners have no basis to object to dismissal.[16]

### IV.

### CONCLUSION

Accordingly, based upon the foregoing analysis, we affirm the judgment of the Circuit Court of McDowell County concluding that the reservation of "the oil and gas" in the 1938 deed did not include CBM due to the general opinion that CBM was a hazard and a nuisance at that time.

Affirmed.

CHIEF JUSTICE KETCHUM concurs and reserves the right to file a concurring opinion.

Chief Justice Ketchum, concurring:

I agree that the Circuit Court of McDowell County was correct in finding that the oil and gas lease did not include coalbed methane gas. In arriving at this conclusion the circuit court relied upon extrinsic evidence to determine the parties' intent in a fact-based case-

---

**16.** We note that the Respondent made a passing reference in its brief that it be afforded an opportunity to raise its accounting claims before the circuit court at the conclusion of the appellate process. To the extent that the Respondent sought to challenge some aspect of the circuit court judgment in this appeal, it had to do so by attempting a cross-assignment of error under Rule 10(f) of the Rules of Appellate Procedure.

Insofar as this was not done, we therefore will not entertain the Respondent's passing reference to this issue. *See Sneberger v. Morrison*, 235 W.Va. 654, 670 n.11, 776 S.E.2d 156, 172 n.11 (2015) ("To the extent that Mr. Morrison was attempting to assert a cross-assignment of error, he has failed to comply with Rule 10(f) of the Rules of Appellate Procedure. Accordingly, we will not address this issue.").

by-case approach adopted in *Energy Development Corporation v. Moss*, 214 W.Va. 577, 591 S.E.2d 135 (2003). I would overrule *Moss* and adopt a bright-line rule to resolve this real estate law question.

In real estate law no title will be certain without bright-line rules. Without bright-line rules title abstractors and deed lawyers will be constantly filing declaratory judgment suits seeking a court opinion to clarify the ownership of real property (fee, surface and mineral). Rather than determining the parties' intent from the four corners of the conveying instrument there will be trials to determine the parties' intent from extrinsic and parol evidence.

We have previously recognized that there must be certainty of ownership in real estate law. "This Court's goal in the area of land ownership is to avoid bringing upon the people interminable confusion of land titles; instead, we must endeavor to prevent and eradicate uncertainty of such titles. *Faith United Methodist Church v. Morgan*, 231 W.Va. 423, 745 S.E.2d 461 (2013).